NOTICE
Decision filed 10/01/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240416

NO. 5-24-0416

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| KEVIN KAYTOR, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 18-L-31 |
| | ) | |
| SOUTHERN ILLINOIS HOSPITAL SERVICES, | ) | Honorable |
| | ) | Christy W. Solverson, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE MOORE delivered the judgment of the court, with opinion.
Presiding Justice McHaney and Justice Hackett concurred in the judgment and opinion.

**OPINION**

¶ 1 The plaintiff, Kevin Kaytor, sued his former employer, the defendant, Southern Illinois Hospital Services (SIH), alleging retaliatory discharge. A jury returned a verdict for plaintiff and assessed damages of $291,251 for economic damages, $250,000 for emotional distress, and $3 million for punitive damages. Judgment was entered on the verdict on February 10, 2023. SIH filed a posttrial motion that was denied on February 21, 2024. SIH filed a timely notice of appeal challenging the jury's verdict and the denial of its posttrial motion.

¶ 2 I. BACKGROUND

¶ 3 This case began on March 23, 2018, with the filing of Kaytor's complaint for wrongful termination in violation of public policy against SIH. An amended complaint, the operative

1

complaint, was filed on June 25, 2018. The amended complaint alleged, *inter alia*, that Kaytor was terminated in retaliation for reporting Medicare and Medicaid fraud and abuse.

¶ 4     The matter was scheduled for a jury trial to begin on January 23, 2023. A pretrial order was entered which, *inter alia*, established a discovery deadline for the parties and required a pretrial memorandum from each party.

¶ 5     On January 12, 2023, SIH submitted its pretrial memorandum, which disclosed eight witnesses for trial. On January 17, 2023, Kaytor filed a written objection to three of the witnesses disclosed by SIH: James McMillan, Page Rushing, and Dave Cullum. The objection was based on the late disclosure of these witnesses after discovery closed on December 23, 2022, one week prior to trial. SIH's answers to interrogatories listed McMillan, Rushing, and Cullum as persons who might have knowledge regarding the case, but did not identify them as witnesses for trial. SIH filed a response in opposition to Kaytor's objection. Presumably this was one of the issues addressed by the trial court at the final pretrial hearing noted in the record sheet; however, neither the trial court's order on these witnesses nor a transcript of the hearing are included in the record before us.

¶ 6     The matter proceeded to jury trial as scheduled. The jury was selected on January 23, 2023, and the first day of trial commenced on January 24, 2023. The following relevant testimony was adduced.

¶ 7     Kaytor was the first witness to testify. At the time of trial, Kaytor was employed as the administrator of the Franklin Williamson Bi-County Health Department. His educational background included two associate's degrees, one in respiratory therapy and one in allied health; a bachelor's degree in business management; a master's degree in business administration; and an American College of Healthcare Executive's degree.

2

¶ 8    Kaytor began working for SIH in 1988, when he was 23 years old. He began as an entry-level respiratory therapist. He testified that he worked his way up through the company into a management position, eventually becoming the supervisor of the sleep center in Carbondale.

¶ 9    In 2002, SIH made the sleep center a standalone department located at St. Joseph's Memorial Hospital (St. Joseph's), which consisted of two beds. At that time, Kaytor was the manager of the sleep center. The sleep center was a diagnostic center to look at individuals having sleep disorders, and it had a clinic to assist patients with their continuous positive airway pressure (CPAP) equipment.

¶ 10   In 2016, at the time of Kaytor's termination, the sleep center had grown to have seven locations throughout southern Illinois with a total of 22 beds. Kaytor testified that he drove the growth of the sleep center to 22 beds by his work with the community, advertising, and developing relationships with other hospitals.

¶ 11   While Kaytor was manager of the sleep center, he reported directly to the hospital administrator of St. Joseph's, who reviewed his performance. He testified that overall, he considered his performance reviews to be very good. Kaytor's performance reviews from 2011 through 2016 were admitted into evidence and published to the jury.

¶ 12   Kaytor's 2011 performance review had an overall performance rating of 2.92 out of 3. The review noted under a collaboration section that Kaytor "[p]lays well with others, employees, patients, and does very well with doctors." Under a team leadership section, the review noted "[i]n the department, the staff functions as a well-oiled machine." The manager completing the review was Scott Seaborn.

¶ 13    Kaytor's 2012 performance review had an overall performance rating of 2.99 out of 3. This indicated that he "fully meets and exceeds expectations." The comments noted that Kaytor was very good at leading an effective team. The manager completing the review was Scott Seaborn.

¶ 14    Kaytor's 2013 performance review had an overall rating of 2.88 out of 3. Comments included, *inter alia*, that "[w]orking with and motivating his people is a strength of Kevin's" and that "[h]e is excellent with his staff, and once again, needs to show this engagement to the broader population." The manager completing the review was John Brothers; however, there were also comments from Scott Seaborn. Kaytor testified that there was a period of transition as Seaborn was retiring and Brothers was taking over the role.

¶ 15    Kaytor's 2014 performance review had an overall rating of 2.0 out of 3, which "fully meets expectations." The manager's comments stated, "I believe that your employees respect and appreciate you. I agree that you are positive with staff and peers." The manager completing the review was John Brothers.

¶ 16    Kaytor's 2015 performance review had an overall rating of 2.46 out of 3, which indicated that he was somewhere between "fully meets expectations" and "outstanding." The comments included "I believe you have shown the 3Cs to your staff." Kaytor testified that the 3Cs stood for caring, commitment, and collaboration. The manager completing this review was Susan Odle.

¶ 17    Kaytor's 2016 performance review had an overall rating of 2.56 out of 3. The review was completed at the end of July 2016, and the manager that prepared it was Susan Odle. The review included six performance goals. Of those six goals, Kaytor was marked as "extraordinary performance" for five of the six goals. The review defined "extraordinary performance" as "top 3% of performance—obviously a Superstar." The goal that was marked "not fully meeting expectations" was related to patient surveys and their satisfaction with the sleep center. A comment

4

noted, "On boarding additional physicians has gone well and shows one of your strengths, guiding the team through the less pleasant changes that are occurring for the sleep services and preparing them for the future."

¶ 18    Kaytor also testified regarding an employment engagement survey that was sent by SIH human resources to all employees. The data was presented to Kaytor as part of the survey was an evaluation of his role as department director. His score was a 5.6 out of 6.

¶ 19    Kaytor testified Dr. Terry Brown became the medical director of the sleep center in 2003. Kaytor testified that when a provider or treating physician ordered a sleep test, the order and office notes would be forwarded to Dr. Brown to make a determination if the test was medically necessary. If the ordered test was determined to be medically necessary, the test was performed at the sleep center.

¶ 20    Kaytor testified that Dr. Brown was the medical director of the sleep center and also had his own private practice called Sleep Medicine Associates. The practice was physically located within St. Joseph's and the standalone sleep center location in Marion. The sleep center and Dr. Brown's practice had a shared waiting room and reception area. There were no physical barriers or demarcations to separate the sleep center from Dr. Brown's private practice.

¶ 21    Kaytor testified he and Dr. Brown had a good working relationship in the beginning. They worked closely together to build the sleep center. Kaytor testified that their relationship changed when he reported his concerns of Dr. Brown not being compliant with the law.

¶ 22    There were three categories of actions that Kaytor believed were violations of the law. First, that Dr. Brown referred hospital patients into his own private practice. Kaytor testified that data was collected regarding when a sleep study was ordered by an outside physician and the study was denied by Dr. Brown due to it not being medically necessary. Kaytor testified he observed

that some of these patients were initially referred by an outside physician and had their test denied; however, once they became patients of Dr. Brown, the test was then approved. Kaytor testified a joint form was prepared by SIH and Sleep Medicine Associates that was given to all patients having a sleep study that were insured by Medicare and/or Health Alliance. The form stated, "[i]in order to be compliant with the insurance guidelines you will need to make an appointment with Dr. Terry Brown, Sleep Specialist."

¶ 23    Kaytor testified he observed differences in how patients insured with Medicaid received their sleep equipment versus those insured by Medicare. A face-to-face visit with Dr. Brown was required for Medicaid patients to receive their equipment. It took approximately 8-12 weeks after a diagnosis of a condition for Medicaid patients to receive their equipment compared to approximately 10 business days for Medicare patients.

¶ 24    The second category of actions that Kaytor believed to be a violation of the law was that Dr. Brown was receiving free rent for his private practice, was using sleep center computers, and was using SIH sleep center supplies for his private practice. Kaytor testified he believed that Dr. Brown violated the Stark Law. Kaytor testified that while working for SIH, he was trained on the Stark law. Based on that training, Kaytor testified his understanding of the Stark law was that it was

> "designed for fair market value for rent, so if you have a provider that has potential to financially incentivize the hospital, financial gain for the hospital, that rent for that physician should be the same for a physician that doesn't have an opportunity to financially improve the hospital, so they are charged the same amount for rent so it's equal."

Kaytor testified that Dr. Brown's practice used the Marion sleep center facility on Tuesdays and Thursdays and Dr. Brown or his staff used the Murphysboro sleep center location Monday through Friday.

¶ 25    Further, Kaytor testified that Dr. Brown would use items from the sleep center's supply closet in his private practice and did not pay for them. Dr. Brown would use the sleep center's durable medical equipment and leave it for the personnel of the sleep center to clean and sanitize after it had been used. Dr. Brown's practice also used the computers at the sleep center locations. Additionally, any typical office supplies needed for a medical practice, like pens and paper, were purchased by SIH and used by Dr. Brown's practice. Kaytor testified that Dr. Brown's practice using SIH supplies without paying for them violated the Anti-Kickback Statute. His understanding was that free rent, the use of medical equipment, and supplies would be an incentive for Dr. Brown to make referrals.

¶ 26    The final category of actions that Kaytor believed to be in violation of the law was that Dr. Brown was using physician assistants (PAs) to interpret sleep studies, when they were unqualified to do so, and that Dr. Brown then signed the interpretations as if he completed them and submitted billing to Medicare. Kaytor testified that data was collected regarding when a study was performed and needed to be interpreted, when it went to Dr. Brown to be signed off on, and when it returned to the sleep center for a copy to be sent to the ordering provider. Kaytor created a document showing that on 13 days between November 11, 2012, and February 8, 2013, Dr. Brown interpreted 20 or more sleep studies in one day. Kaytor testified, based upon his observations of working with Dr. Brown, that it typically took approximately 30 minutes for Dr. Brown to interpret a sleep study. Based off the number of studies that Dr. Brown signed off on, Kaytor believed Dr. Brown was

7

violating the False Claims Act that applied to Medicaid and Medicare patients because he was signing off on sleep studies that had been interpreted by PAs.

¶ 27 Regarding how Kaytor learned of the aforementioned actions, he testified that, in 2013, Ann Kern, the property manager for SIH in the financial administration department, contacted him because she was looking into the fair market value of the Marion sleep center. Kern needed information on how Dr. Brown's private practice used the sleep center location. Kaytor assigned Donna Draper, the lead sleep technologist at the Marion facility, to assist Kern. Through this process, Kaytor learned that Dr. Brown was using the office space two days a week but was only paying rent for one day a week.

¶ 28 After this information was provided to Kern, Kaytor thought Dr. Brown reacted badly. Kaytor stated Dr. Brown started writing Draper out of a job through the orders he made for his patients. Prior to the report, Draper was the lead sleep technologist and she assisted patients in the CPAP Solutions Clinic at the Marion sleep center. After the report, Dr. Brown's orders required a registered respiratory therapist (RRT) to see the patients in the clinic. Draper did not have these credentials, so she was unable to assist patients in the clinic. Kaytor testified that Draper had other certifications that trained her on how to help patients with their CPAP equipment. Kaytor testified that he and Draper had a phone conversation with Dr. Brown on February 26, 2024, regarding the change in his orders. Kaytor testified:

> "In the phone conversation me and Donna had with Dr. Brown after we learned that he was writing these orders for RRT, he told Donna he was retaliating against her, she would not have a job, and if she didn't know how to spell retaliation, ask him, and Kevin is not a good speller, so it was really bizarre."

8

After this conversation, Kaytor testified he and Draper reported to Susan Odle on February 28, 2014, that Dr. Brown was changing his orders to retaliate against Draper. Kaytor testified Odle's response "basically said [Dr. Brown's] in the position he can do whatever he wants to do."

¶ 29    Following the report, Kaytor received an e-mail from Dr. Brown. On April 1, 2014, Dr. Brown sent an e-mail to Amanda Winter, and Kaytor was included as a carbon copy. The subject of the e-mail was "bullying." The e-mail from Dr. Brown stated,

> "Kevin said you guys were bullying Donna. So I guess the pressure is working. I told him it was the other way around, that Prima Donna was bullying you all. I have another idea we can think about, short of the nuclear option. We could all go down to complain to the head HR office. Both of you, Sarah, and me. You would need to remember all the things Donna has done—or at least the more salient ones."

The same day he received the e-mail, Kaytor forwarded it to Susan Odle—his supervisor; Shelly Pierce—vice president of corporate quality management; April Holmes—director of corporate compliance; John Brothers—administrator; and Kelly Stevens—human resources (HR) manager for St. Joseph's. Kaytor testified nothing changed regarding the retaliation after the email was sent to his superiors. He was told that "Dr. Brown is a physician and he can do whatever he wants to do."

¶ 30    After reporting the aforementioned concerns to his superiors, Kaytor's annual evaluation for the review period of May 9, 2014, through July 31, 2014, had the following comments under the category of development goals: "I believe you need to work at repairing the relationship that you previously established. Continue to 'patch' and restore your previous relationship with the medical director." Kaytor testified the message he received from administration after reporting his concerns was that "Dr. Brown can do whatever he wants to do."

9

¶ 31    Kaytor's 2015 evaluation, completed by Odle, noted, "Improvement is needed in areas of collaboration, especially with the medical director, and reducing the discord the staff experienced as a result of this." Kaytor testified that, at this time, Odle had taken no action to repair the retaliatory relationship.

¶ 32    Kaytor testified regarding reports made to the compliance department in 2016. On January 13, 2016, Kaytor e-mailed April Holmes, the director of corporate compliance, regarding his concerns about fraud with the ordering of split studies. Kaytor said Dr. Brown's behavior continued after this report.

¶ 33    Kaytor testified regarding a department staff meeting he conducted on February 10, 2016. He stated a staff member mentioned that Dr. Brown had written Draper out of the CPAP clinic. Dr. Brown responded that Kaytor took Draper out of the CPAP clinic, and Kaytor disputed Dr. Brown's response. Kaytor described Dr. Brown's response to the disagreement as having a beet-red face and raised fists. Kaytor was fearful that Dr. Brown was going to hit him. The meeting ended. Kaytor testified he reported the incident to Odle and Stevens and made a formal written complaint to SIH on February 15, 2016.

¶ 34    On October 17, 2016, Kaytor e-mailed Rex Budde, the chief executive officer (CEO) of SIH, regarding the issues he had previously reported to Odle and Holmes. Kaytor testified that Budde had called him after two other employees of the sleep center went to see him on October 12, 2016. Kaytor followed the conversation with an e-mail of October 17, 2016. Kaytor testified that Budde met with him to discuss the e-mail and following that e-mail, Budde requested additional information from Kaytor. On October 24, 2016, Kaytor e-mailed the requested information about denials of sleep studies; Odle was included in this e-mail, as Budde had included

her in his e-mail requesting additional information. Kaytor testified he had no further contact with Budde.

¶ 35    On November 3, 2016, Odle e-mailed Kaytor and instructed him to prepare a level II discipline or "write up" for four employees for their conduct during a staff meeting in October. The e-mail recounted the disagreements that staff had with Dr. Brown. Odle wrote this conduct was insubordination. Kaytor testified he disciplined the employees as instructed by the deadline given.

¶ 36    On November 22, 2016, Kaytor was called to a meeting at the corporate conference room in the legal area. Kaytor met with Odle, Emily Reiman, an auditor for the compliance department, and Pam Henderson, the vice president of HR for SIH. Kaytor testified that Reiman stated that all of the concerns Kaytor reported regarding Dr. Brown had no standing, and, other than needing to place a lock on the supply closet, everything Dr. Brown was doing was fine. Reiman also told Kaytor she had audited the CPAP clinic in 2015, and the clinic was not in compliance because there were handwritten stars under the place where the physician would sign. Next, Odle asked Reiman to leave the room, and Odle told Kaytor he was being terminated. Kaytor testified that Odle terminated him because she said he did not show leadership. Kaytor testified that, before this, Odle had no concerns with his job performance.

¶ 37    After his termination from SIH, Kaytor was able to find an as-needed night position at Red Bud Memorial Hospital in Red Bud, Illinois, as a night sleep technologist. He worked in this role for three months. At the same time, Kaytor worked in Evansville, Indiana as an as-needed night sleep technologist. Kaytor's commute to Evansville was a two-hour drive one way. Next, Kaytor obtained full-time employment in Vincennes, Indiana as a night sleep technologist. He was employed in this position from March or April 2017, through July 2017. He worked three 12-hour

11

shifts. Vincennes, Indiana was a two to three hour commute. Kaytor testified that the hospital allowed him to sleep in a recliner in one of the bedrooms during the day. He would shower in the maintenance area of the hospital and then work his night shift. Kaytor testified it felt depressing to be working as an entry-level sleep technologist again. Prior to his termination, the last time he worked as a sleep technologist had been in 2002.

¶ 38    In July 2017, Kaytor obtained a position at Franklin Williamson Bi-County Health Department (Bi-County). He testified the salary was less at Bi-County, as were the benefits. Kaytor reviewed his W-2s and paystubs to calculate what he thought his economic loss was as a result of his termination from SIH. This calculation included estimating what he thought salary increases at SIH would have been based off his historical increases. Kaytor believed his lost wages from SIH totaled $269,135. The value of his lost vacation time was $89,675. The loss of matching 401k contributions was $32,681. The cost of increased health insurance premiums for Kaytor was $19,616. Based on the foregoing, Kaytor believed his total economic loss as a result of his termination was $411,107.

¶ 39    As for emotional losses, Kaytor testified that, as a result of the termination, he was embarrassed, ashamed, and sad. Kaytor testified he was unable to tell his children about his termination, and they learned it from other sources. Kaytor said the experience devastated him. Kaytor testified he would not shop locally for fear of seeing a former coworker.

¶ 40    On cross-examination, Kaytor testified he was aware of polices that SIH had related to employment, discipline, improvement counseling, and compliance allegations. Kaytor agreed that he made a complaint to compliance in 2013 regarding the rent issue.

¶ 41    Kaytor confirmed that he and Draper have been in a romantic relationship since 2011. He agreed that Dr. Brown, as the medical director and only physician for the sleep center, could require tests be completed by those with certain credentials.

¶ 42    Kaytor was questioned regarding a level III written warning he received on September 14, 2015, and the accompanying corrective action plan. The discipline and action plan involved inappropriate pay to Draper. Kaytor received a three-day suspension with pay.

¶ 43    Kaytor was cross-examined regarding the October 2016 staff meeting that resulted in written discipline for four staff members. Kaytor stated he did what he was told to do by his boss, Odle.

¶ 44    Kaytor was asked about his 2015 performance evaluation and the score that he was "not fully meeting expectations" as to patient survey scores. There was also an e-mail in July for all managers regarding productivity. Kaytor had some concerns about meeting the goal that had been established.

¶ 45    On cross-examination, Kaytor again discussed the meeting on November 22, 2016, with Reiman, Odle, and Henderson. Reiman spoke first in the meeting and discussed the CPAP clinic audit. Reiman stated there were concerns after a re-audit was conducted. Reiman noted she had investigated Kaytor's concerns with the clinic and found no issues. Next, Odle spoke to Kaytor and terminated him for not showing leadership.

¶ 46    Regarding damages, Kaytor repeated that he felt like being fired from SIH for reporting wrongdoing was like a death. He stated being fired was the worst thing that has happened in his life and it still haunts him. Kaytor was asked if any other part of his life caused him stress or emotional or physical distress. Kaytor testified he had been through a fight with cancer after being fired and, at the time of trial, was cancer-free. He acknowledged the cancer caused stress, but felt

it was different to be fired. Kaytor testified he did not see a medical provider or mental health provider for anything related to his termination.

¶ 47    On redirect examination, Kaytor testified he received the level III warning for scheduling employees to work seven days in a row. He also testified that when Draper was promoted to lead technologist, she was one of the two people who applied for the position. Additionally, HR was aware that Kaytor and Draper were in a romantic relationship.

¶ 48    Sammie Prest testified for the plaintiff. Prest testified that she is currently a registered respiratory therapist (RRT) working at Pinckneyville Community Hospital. Prest formerly worked for SIH in the sleep lab. She started working for SIH in 2010, and she resigned effective January 1, 2018.

¶ 49    When she started at SIH, she was a registered polysomnography tech (RSPGT), which is also known as a sleep technician. Kaytor was her boss when she worked at SIH. Prest gave her opinion about Kaytor as a boss. She felt he was a normal, everyday boss that was not perfect, but was good to her. Prest did not think Kaytor favored any of the sleep center employees.

¶ 50    Prest also testified about her experience working with Dr. Brown. At first, she did not have any problems or issues working with Dr. Brown. She said at the end of her employment with SIH, she recalled it being hostile. She thought Dr. Brown was unfair in meetings. She also recalled being called off of work because studies were being denied. She felt Dr. Brown was working against the sleep center.

¶ 51    Prest and another coworker, Lori Williams, met with CEO Budde to express their concerns. Prest stated she felt Kaytor's hands were tied, and he was doing everything he could and that Odle already knew of the problems, so she wanted to report them to Budde.

14

¶ 52    Prest did not recall the October 2016 staff meeting or whether she was disciplined. Prest agreed that she was not terminated after she spoke to Budde.

¶ 53    Heather Harris testified on behalf of the plaintiff. Harris testified that she was currently employed as a medical secretary for Prairie Cardiovascular in Carbondale, Illinois. Prior to working at Prairie Cardiovascular, Harris worked for almost 10 years at SIH as a scheduler in the sleep center. She started working in this role in June of 2015. She took calls from provider's offices, which were referring patients to the sleep center, and then scheduled the appointment. Kaytor was her manager.

¶ 54    Harris described Kaytor as a hands-on manager. She described him as a fair and understanding person. Harris stated anytime she had an issue, Kaytor would attempt resolve it. If he could not, he would direct her to someone else who could help. Harris worked during the day shift, so she did not interact with many coworkers. Harris did work with Draper, and she described her as a happy person who enjoyed helping patients. She felt they worked well together. Harris also worked with Dr. Brown. She stated she felt intimidated by him. He sometimes made her feel like she was not smart enough for the job.

¶ 55    As the scheduler, Harris would see all of the orders that came to the sleep center. This information would be presented to Dr. Brown, who would then determine if the study was necessary. If the order was denied, Harris would notify the patient and/or the ordering provider. Harris noticed that some denials would have a follow-up appointment with Dr. Brown and then a study would be ordered and approved. She testified that, in 2015, she did not see many denials, but denials started increasing in the fall of 2016.

¶ 56    Harris testified regarding staff meetings. She said staff meetings were mandatory. She recalled what she described as a "pretty rough" staff meeting about denials. Harris stated she called

15

Dr. Brown a liar in the meeting because she was aggravated and knew the information he was presenting was false. Harris believed the information about the number of denials Dr. Brown was presenting was inaccurate. Harris received a written write-up as a result of this staff meeting. She voluntarily resigned after Kaytor's termination.

¶ 57   Rex Budde was called as a witness by the plaintiff. Budde testified that, prior to his retirement on December 31, 2022, he served as the president and CEO of SIH. Budde testified regarding SIH's compliance program. A compliance program handbook was provided to each SIH employee and provided that each member of SIH's workforce was obligated to be familiar with the applicable laws and regulations and comply with those. The board of trustees for SIH had a compliance committee, and SIH had a compliance department.

¶ 58   Budde reviewed an e-mail that was sent to him by Kaytor regarding a meeting. It refreshed his recollection that a meeting had occurred; however, Budde testified he did not remember the details of the meeting with Kaytor. The e-mail relayed the concerns that Kaytor had regarding the sleep center and Dr. Brown.

¶ 59   Budde acknowledged that Kaytor's supervisor, Odle, became aware of Kaytor's communications with Budde because Odle was copied on the e-mails. Budde did not recall any specific conversations with Odle on this topic.

¶ 60   Budde testified his practice would be to involve the compliance department if concerns were reported to him. He was provided an e-mail in which the sleep study rates were declining, and Budde indicated the decrease could be Dr. Brown "responding to tougher regulations, but I don't completely trust him either." Other than one e-mail from Holmes that commented "it doesn't look bad or something to that effect," Budde did not receive a report or determination regarding whether the issues Kaytor raised rose to the level of fraud or abuse.

16

¶ 61   Budde testified he did not participate in the process of terminating Kaytor and did not know anything about why Kaytor was fired.

¶ 62   Budde acknowledged that healthcare organizations are required to comply with Medicare and Medicaid. Violations of Medicare and Medicaid regulations could result in the organization returning fees that had been paid for services that were billed or performed in violation of those regulations. Violations could also result in the healthcare organization being suspended from participating in the programs which would be detrimental to the organization. Budde estimated that 42% to 45% of SIH's income was from Medicare patients. It would also be detrimental to Budde, who received bonuses based on revenue in addition to his salary. Tax documents were introduced into evidence that showed Budde was the highest paid employee of the organization in 2020 with a salary of $1,051,964.

¶ 63   On cross-examination, Budde testified that SIH was a not-for-profit corporation that does a significant amount of charitable work. He indicated SIH loses money from that charitable work. On redirect examination, Budde acknowledged that SIH was required to treat indigent patients under federal law. Additionally, tax documents indicated that in 2020 SIH had $46 million in excess revenue, so SIH did not lose money every year. Additionally, in 2020, SIH made $10 million in interest on investments.

¶ 64   Budde testified that he handled the hiring and firing of individuals who reported directly to him. Otherwise, those issues would be handled by the SIH human resources department.

¶ 65   Lori Williams was called as a witness for the plaintiff. Williams is a registered respiratory therapist who was formerly employed by SIH conducting sleep studies. She worked with Kaytor as her boss. She testified that she thought he was a good boss who was kind and listened to everyone's input.

¶ 66    Williams also worked with Dr. Brown. She testified that in the beginning of her employment, it was fine working with Dr. Brown, but it became volatile. She stated Dr. Brown was degrading towards sleep technologists. She only observed Kaytor and Dr. Brown together during meetings, which were generally positive until the end.

¶ 67    Williams testified regarding a statement she heard Dr. Brown make while he was in a patient room. She explained that at the very beginning of every sleep study, video and audio recording equipment is turned on. The sleep technologist can then see and hear what is happening in the patient room at his or her workstation. Williams testified that, through this equipment, she heard Dr. Brown speaking to Judy Elmore, an employee of the CPAP clinic. "He said that he pretty much wanted to take Kevin [Kaytor] down for retaliation, evil retaliation would be his exact words."

¶ 68    Williams recalled at a staff meeting that Dr. Brown told all the employees they needed to find different jobs because the jobs they had would be coming to an end. She stated she felt very degraded. She recalled responding to those statements in the meeting, but not exactly what she said. She reported Dr. Brown's statements to Odle and Budde. Williams resigned from her position at the sleep center in 2017.

¶ 69    Next, plaintiff called Jody Kennedy as a witness. Kennedy formerly worked as a registered sleep technologist at SIH with Kaytor as her boss. She testified that Kaytor was a good boss and one of the best bosses she has ever had.

¶ 70    She also worked with Dr. Brown. Kennedy stated that, at first, working with Dr. Brown was good and she felt like she could talk to him about anything. She felt this changed after a staff meeting where Dr. Brown became angry with Kaytor. She described Dr. Brown as being angry and making a fist as he stood up. She felt scared of him at that moment. Kennedy filed a report

18

with the hospital regarding this incident. The report was introduced into evidence. In the report, Dr. Brown was named as the practitioner being reported. The description of the incident in the written report was "It was a very hostile environment and I didn't feel safe. Dr. Brown attacked Donna Draper and Kevin Kaytor for not being competent. I feel unsafe to work around Dr. Brown."

¶ 71    Donna Draper was called as a witness by the defendant. Draper first worked for SIH as a sleep technician for less than one year in 2000. She returned to working as a sleep technician at SIH in September 2006. Draper worked 12-hour overnight shifts, monitoring patients undergoing sleep studies. At this time, Kaytor was the director of the sleep center, and Dr. Brown was the medical director of the sleep center.

¶ 72    Draper testified she took courses regarding sleep medicine and received certifications following exams. She was a registered sleep polysomnography technologist (RPGST), a registered sleep technologist (RST), and a certified clinical sleep educator (CSE).

¶ 73    Draper received a promotion and became the CPAP Solutions Clinic specialist on day shift. The CPAP Solutions Clinic assisted patients with their CPAP equipment.

¶ 74    The next promotion Draper received was in 2011, when she became one of two lead sleep technologists. Eventually, as a lead sleep technologist, Draper would have morning meetings with the other technicians regarding any feedback from the medical director and review sleep study information from the prior week. Draper was also in charge of all of the lab technicians and would be on call for any issues that may arise or if anyone needed to call her to miss work due to an illness. Draper also conducted sleep studies for patients and assisted patients with their CPAP equipment.

¶ 75    As the lead sleep technologist, Draper worked closely with Dr. Brown. She went to Dr. Brown with any medical questions she had, and he interpreted the sleep studies she performed.

Draper stated she and Dr. Brown got along very well. Dr. Brown told Draper several times that she was his favorite technician, complimented her, and took her to lunch a couple of times. Her relationship with Dr. Brown changed in February 2014.

¶ 76 Draper explained in the fall of 2013, she was asked to meet with Beth Ann Kern, the property manager for financial administration. Kern met with Draper at the Marion sleep center location. Draper showed Kern around the entire office. Kern asked Draper regarding Dr. Brown's private practice, including how many days a week Dr. Brown was at the facility, what rooms he used, and what computers, equipment and supplies he used. Draper told Kern that Dr. Brown used the office two days a week for his private practice and showed Kern the rooms and equipment he used.

¶ 77 Draper testified that, after this meeting, her relationship with Dr. Brown changed. Dr. Brown began writing orders that patients at the CPAP clinic in Marion had to see an RRT, a certification that she did not have. For the seven years prior to this, Draper had been seeing patients at the CPAP clinic in Marion and the orders did not require an RRT. She told Kaytor about this, and Kaytor spoke to Odle. Draper also spoke to Dr. Brown regarding this issue during a telephone conversation. Draper testified Dr. Brown told her that he was not going to write any orders for her to see patients at the clinic. He also said, "this is called retaliation and if you can't spell it you can ask Kevin how to spell it for you." Draper and Kaytor met with Odle regarding Dr. Brown's statements. Draper recalled Odle said she would look into this issue.

¶ 78 Draper testified that Dr. Brown stopped sending her e-mails with feedback to pass onto the technologists in their meetings. Dr. Brown stopped answering phone calls from Draper. She also said Dr. Brown would call her names like "fat a***" and "b***." Draper stated that Dr. Brown's

20

staff also treated her poorly and called her names. After Kaytor was terminated, Draper was in a control room, and Dr. Brown came behind her and said, "You are next, fat a\*\*\*."

¶ 79   Draper had a second meeting with Kern later in 2013. Draper told Kern she was nervous about meeting with her again due to the retaliation. They again went over what Dr. Brown was using in his private practice. Kern told Draper that Dr. Brown was only paying rent to use the office one day a week instead of two, and SIH will owe millions of dollars to the government because of this.

¶ 80   Draper stated her relationship with Dr. Brown did not improve throughout 2013, 2014, or 2015. On June 3, 2016, a meeting was called by Odle regarding the working relationships in the sleep center. At that meeting, Odle announced the RRT credential was no longer required to work in the CPAP Solutions Clinic. Dr. Brown acknowledged this was his concession. On June 10, 2016, Draper was called to Odle's office and was told she was being demoted from the lead technologist position, which included a decrease in her pay. Draper disagreed with this and filed a grievance. The written grievance relayed Draper's disagreement with her demotion for poor performance, as all of her performance evaluations indicated excellent performance and no issues had been raised with her prior to her demotion. After filing the grievance, Draper was called to a meeting with Odle. At this meeting, Odle told her she was no longer being demoted. In July 2016, Odle completed a performance review for Draper, which was very favorable with many notations of extraordinary performance. Draper is no longer employed at SIH.

¶ 81   Draper testified she and Kaytor began a romantic relationship in 2011 and discussed this with HR for SIH. At the time they began dating, there were no polices at SIH prohibiting this. Eventually a policy was made prohibiting dating a supervisor. When this policy took effect, Draper

reported to Odle as her supervisor instead of Kaytor. As of trial, Draper and Kaytor were still in a romantic relationship.

¶ 82    After Kaytor was terminated, Draper observed Kaytor and described him as being totally devastated, sad, depressed, and withdrawn. He did not interact much and did not have a lot to say. Kaytor did not want to go shopping anywhere locally for fear or running into someone he knew from SIH. When they would go shopping out of town, Kaytor would comment that he could not add anything to the shopping basket because he did not have a job. Before his termination, Kaytor was an avid hunter. He would bow hunt for deer and turkey. After his termination, he lost all interest in hunting. Since Kaytor found new employment, he has gone hunting once with his son, but not like before.

¶ 83    On cross-examination, Draper acknowledged that she was not removed from her position as a lead technologist and her salary was not reduced. She no longer works for SIH due to her time off under the Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601 *et seq.* (2012)) running out. Draper and Kaytor are also engaged to be married.

¶ 84    The evidence deposition of Dr. Fakhre Alam was read to the jury. Dr. Alam first met Kaytor in 1999 when he began practicing at Memorial Hospital in Carbondale. He initially worked with Kaytor until 2002, but did not work with Kaytor again until 2015.

¶ 85    Following Kaytor's termination, Dr. Alam wrote a letter of reference for Kaytor to use in his job search. Dr. Alam testified that he was trying to be as kind as possible to Kaytor and to help him. The letter noted that Kaytor had excellent leadership qualities, and he had transformed the sleep center into a successful business. He noted that Kaytor was well liked by his peers. The letter also stated that Kaytor had a phenomenal knowledge of the sleep study field and he was an expert in scoring sleep studies. Dr. Alam wholeheartedly recommended Kaytor to prospective employers.

22

¶ 86    Dr. Alam hired Kaytor on a contractual basis after his termination. Kaytor scored sleep studies remotely for Dr. Alam.

¶ 87    The evidence deposition of Dr. Suhail Istanbouly was read to the jury. Dr. Istanbouly testified he had known Kaytor for approximately 20 years. Dr. Istanbouly is a pulmonologist, and Kaytor would visit his office to promote the sleep center. In 2016, Dr. Istanbouly passed his medical board exam in sleep medicine and started to meet with Kaytor more at that time. Dr. Istanbouly was required to spend a specified number of hours weekly in the sleep center for credentialing purposes.

¶ 88    Dr. Istanbouly had no problem with Kaytor. After Kaytor was terminated, he asked Dr. Istanbouly to be a reference. Dr. Istanbouly was presented with a letter of reference regarding Kaytor. Dr. Istanbouly acknowledged that it was his signature on the letter, and the contents were true, but he did not recall if he wrote the letter of if Kaytor did.

¶ 89    The reference letter noted Kaytor was respectful towards the physicians he worked with. He had productive and collaborative relationships with the physicians he worked with. Kaytor worked well with his staff and led good meetings. The letter indicated Kaytor had an excellent work ethic. Dr. Istanbouly did explain the purpose of this letter was for Kaytor to find a job, and it was not prepared for a legal dispute. However, the information in the letter was truthful.

¶ 90    Dr. Istanbouly testified regarding an instance when he referred one of his patients for treatment at the sleep center and Dr. Brown sent the patient a letter referring them to his private practice. Dr. Istanbouly complained to SIH regarding this.

¶ 91    Dr. Istanbouly also testified regarding an instance where one of his patients was denied a procedure as not medically necessary. The patient was then evaluated by Dr. Brown's nurse

practitioner, and the procedure was approved. Dr. Istanbouly complained to the administrator at St. Joseph's at the time, Odle. Dr. Istanbouly thought this happened in 2016 or early 2017.

¶ 92     Dr. Istanbouly stated he complained about a few things in the sleep lab concerning Dr. Brown. He felt Dr. Brown was not looking out for the patients or the sleep lab and was looking out for himself. Dr. Istanbouly complained about Dr. Brown having his private office inside the sleep lab.

¶ 93     Dr. Istanbouly was asked regarding the relationships and general atmosphere at the sleep clinic in 2016. He noted it was clear there was some type of disagreement between Dr. Brown and Kaytor. There was a disparity between the medical director and the rest of the staff. Dr. Brown was controlling things in a way that was not best for the patients. Dr. Istanbouly observed that Dr. Brown would become angry with staff. The plaintiff then rested his case.

¶ 94     Budde was recalled as a witness as part of the defendant's case. Budde testified that while he was CEO, he had never terminated anyone or disciplined anyone for making a report to compliance or to him.

¶ 95     Emily Reiman was called as a witness for the defense. Reiman had been employed for SIH for 13 years. At the time of trial, she was employed as part of the compliance department as the internal auditor for SIH. As the internal auditor, she reviewed internal policies for the corporation and validated financial expenditures throughout the corporation. She also performed investigations for the compliance department. There are many ways that concerns can be reported to compliance, including a phoneline that allows for anonymous reports.

¶ 96     Reiman was involved in an audit of the sleep center in 2015. The audit began with two concerns that were brought to the compliance department regarding the types of patients that were being referred to the CPAP Solutions Clinic. Her audit was to review the physician orders and the

accuracy of the orders and to make sure there was proper documentation for the patients visiting the CPAP unit. Prior to the audit, a 16-day scope was selected and 30 random patients were selected. The audit revealed that prepopulated orders were being faxed from the sleep center to a primary care physician with all the information completed except for a large asterisk indicated where the physician should sign. This was not allowed, as it could be considered a self-referral. If this was not corrected, it could cause legal problems for SIH. Reiman provided her audit report to Odle.

¶ 97    In 2016, Reimen performed a re-audit of the sleep center to determine if the issue had been corrected. The re-audit was performed one week prior to the termination meeting with Kaytor. The re-audit revealed that a prepopulated order template was still being sent to primary care physicians. Reiman met with Odle and Kayto on November 22, 2016, regarding the findings of her re-audit. Reiman testified Kaytor seemed distracted during the meeting and did not have any questions for her. Kaytor indicated they would try and do better.

¶ 98    On cross-examination, Reiman testified that, in addition to the re-audit, the meeting was also to discuss complaints made about Dr. Brown through the compliance helpline. Reiman was presented with an agenda for the November 22, 2016, meeting with Kaytor. Initially, Reiman testified she created the agenda; however, the formatting information of the agenda indicated that it was created by Odle. Reiman went to a meeting called by Odle, with an agenda prepared by Odle. At the beginning of the meeting, Reiman told Kaytor every allegation brought forth had to be investigated with due diligence.

¶ 99    The agenda prepared by Odle provided:

"Update on preliminary findings related to Dr. Brown and the Sleep Center

Issues are unfounded at this time. One incidental finding or [*sic*] computer usage. This was identified and has been worked on with a resolution.

Investigation by Compliance department on issues related to CPAP Solutions Clinic reviewed included:

—Medical Director is not approving orders for the patients seen in the Clinic.

Discussion: Orders from Dr. Brown included a one-time only. Additional visits were ordered by a physician other than Dr. Brown.

—Staff are soliciting direct referrals to the clinic from non-treating physician.

Discussion—Prepopulated orders are being faxed to a physician who is not the treating physician for a signature.

—The CPAP solution clinic is being over utilized.

Discussion—In 2013 there was a marked decline in the number of orders signed by Dr. Brown and the number of orders written by other physicians increased."

¶ 100   Reiman acknowledged that other physicians besides Dr. Brown could make orders for a patient to be seen at the clinic. She was also aware of Draper's complaints of retaliation in 2013, which were made around the same time that Dr. Brown's orders decreased. She agreed that if Dr. Brown's orders decreased, it was possible that more orders from Dr. Alam and Dr. Istanbouly, as well as other physicians, would be received to help patients with their CPAP equipment.

¶ 101   Regarding the prepopulated form, Reiman acknowledged that an outside physician could have called the secretary of the clinic and requested their patient be seen. The secretary is not responsible for medical records. An order was then faxed to the physician's office.

¶ 102   When the re-audit was performed, Reiman used the same methodology of pulling random patient's medical records. After the meeting, Reiman destroyed the forms because they had patient

26

information. Reiman did not make any notes in order to find the information she used later. At the time of the re-audit, the forms had been changed, and a different template was being used. A sharpie mark indicating where to sign was still present. Reiman never prepared a report regarding her findings from investigating the issues raised regarding Dr. Brown and the sleep center.

¶ 103   At the time of the November 22, 2016, meeting, Reiman was aware that Dr. Brown was very possessive about the patients that were going to the sleep center. Dr. Brown was not happy that two other physicians were being credentialed to interpret studies at the sleep center, so his revenue would decrease.

¶ 104   After Reiman completed the 2015 audit, she recommended that SIH have a professional consulting firm conduct an audit, as she was new to the position and wanted someone more familiar with sleep medical to conduct an audit. SIH hired Premier to conduct an audit. The Premier audit was done in September 2016 and only found issues with the CPAP clinic that were areas for which the medical director, Dr. Brown, was responsible.

¶ 105   On redirect examination, Reiman testified that, at the time of the November 22, 2016, meeting, she knew that Kaytor might be terminated. However, Reiman did not have a role in the decision that terminated Kaytor.

¶ 106   On recross-examination, Reiman acknowledged that the local coverage determination allowed someone other than a physician to create a detailed written order that is then signed by the physician. This is required before billing health insurance.

¶ 107   The next witness called by the defense was April Holmes.[1] Holmes had been the director of the compliance department for SIH since 2004. She also served as a compliance officer and previously as an internal auditor. As the director of compliance, Holmes oversaw the compliance

---

[1]April Holmes married and, at the time of trial, had changed her name to April Peters. For consistency, she will be referred to as Holmes throughout this disposition.

27

program at SIH and reported directly to the general counsel of SIH and the board of trustees. Holmes also shared information with the CEO regarding audits, investigations, regulations, and government and/or insurance enforcement.

¶ 108 Holmes testified there are many ways an employee may report a compliance issue, including by calling a telephone line, using a website, or telling any member of the compliance department. Employees may remain anonymous when they report. SIH employees are trained in compliance and reporting as part of the hiring process and through annual refresher training. Various compliance policies were admitted into evidence.

¶ 109 Holmes was aware Kaytor made reports to the compliance department. Some of these reports Kaytor asked to be kept anonymous. Holmes had all of these complaints investigated. Dr. Brown was found to have been using the space beyond his lease and was required to pay the difference in what space he used and what he previously paid under the lease. Compliance did not find any documentation proving that Dr. Brown's PAs were interpreting sleep studies. The compliance department was made aware of allegations of bullying against Draper. Compliance investigated them, but did not make any findings. Holmes testified this was outside the scope of a compliance investigation and would be an HR issue.

¶ 110 Pamela Henderson was the next witness called for the defense. Henderson is the vice president for human resources at SIH. Henderson has worked for SIH for almost 30 years. HR provides a new hire orientation to, among other things, go through SIH's policies and procedures and the employee handbook. SIH's HR department employs approximately 50 people, and each SIH hospital has an HR employee at the facility.

¶ 111 Henderson reviewed and discussed the Improvement Counseling Policy, which contained a progressive discipline policy. It is a four step policy. The first step is a verbal warning. The

28

second step is a written warning. The third step is a final written warning; it generally comes with probation. The fourth step is termination of the employee. Henderson stated the discipline escalated if it was within the same category of disciplinary action. She explained job performance would be a category.

¶ 112   Henderson testified that HR is also responsible for setting salary ranges for each position. Each position has a minimum and maximum salary range. Employees may also receive an annual merit increase to their salary. Employees reaching the maximum salary may receive a lump sum bonus at the end of the year as their merit increase.

¶ 113   Henderson attended the meeting on November 22, 2016, when Kaytor was terminated. She attended to provide guidance and support if anyone had questions regarding HR policies or processes. Henderson recalled that Odle had a discussion with Kaytor and terminated his employment due to job performance. Henderson did not recall the specific issues with Kaytor's performance but that generally "he was not performing his job as he should." Henderson did not recall any subject matter discussed or anyone's reactions during this meeting.

¶ 114   Odle was the last witness called for the defense. Odle is a registered nurse who worked for SIH from 1997 through 2000 as a home health nurse and manager. She returned to working at SIH in 2010 as the manager of quality programs related to government regulations, including Medicare and Medicaid. In May 2015, Odle became the administrator of St. Joseph's.

¶ 115   Odle worked with the former administrator, Brothers, to complete Kaytor's 2015 performance evaluation. Odle noted that Kaytor performed well in some areas and not well in others. She testified that Kaytor did not perform as well in leadership because the relationship with the medical director needed to be repaired and productivity needed to improve. Odle testified after

discussing the evaluation with Kaytor, she changed her evaluation of his performance to "exceeds," given the challenges his department had been facing.

¶ 116 Odle testified she was made aware of the 2015 audit findings and she shared them with Kaytor. In 2016, Odle did not request a re-audit. She was informed the re-audit still revealed a problem with the order forms.

¶ 117 The report from the first audit was completed in November or December 2015. Odle stated she asked Kaytor to prepare an action plan to address the issues in the audit. When one was not prepared after several weeks, she prepared one and gave it to Kaytor. Kaytor then completed the items on the action plan.

¶ 118 Odle testified regarding the level III written warning she gave to Kaytor in September 2015. An action plan was created for Kaytor following this warning. Odle testified she continued to have discussions with Kaytor at the monthly meetings regarding his leadership.

¶ 119 In March of 2016, a consultant was brought in because the team at the sleep center and clinic had become very dysfunctional. Odle specifically mentioned the relationships between Dr. Brown, Kaytor, and Draper.

¶ 120 Odle was at the staff meeting on October 12, 2016. She described the meeting as turning into a shouting match. Odle testified Kaytor did nothing to stop the behavior and participated in it as well. In the days after the meeting, Odle told Kaytor the conduct was unprofessional and not acceptable. Odle had discussed the meeting with HR, and the recommendation was to give level II written warnings to each individual who acted inappropriately during the meeting. Kaytor did give the warnings to the individuals.

¶ 121 Between November 8, 2016, and November 22, 2016, Odle testified she started evaluating Kaytor's job description and whether he was doing what he needed to do. Odle testified that part

of the job description included "Job Roles," which included managing processes effectively in regard to patient and employee safety. Odle testified that the general work environment was difficult and unsafe. She felt Kaytor was not doing anything to make the environment safer. She noted Kaytor "continued to not develop his relationship with Dr. Brown even into the minimum of what a working relationship could be." She took issue with recordkeeping, the failure to promote a culture of improvement, and the management of the number of staff. After completing this review, Odle determined Kaytor could not continue in his role at SIH. She testified this was a heavy decision. She also stated Kaytor's reports to compliance had nothing to do with her decision to terminate him.

¶ 122   On cross-examination, Odle acknowledged the complaints of bullying regarding Draper. Odle was involved in an investigation and discussion with Dr. Brown regarding him being a disruptive physician. He was notified of the complaint in writing. The letter stated, *inter alia*, "I hope that you will use this opportunity to familiarize yourself with the enclosed Physician Behavior Policy and commit to ensuring that your future actions are consistent with this policy in the spirit of continuance performance improvement." The defendant then rested its case. The jury was excused, and a jury instruction conference was held.

¶ 123   Plaintiff's Instruction 2 was based on the Illinois Pattern Jury Instructions, Civil, No. 250.01 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 250.01), and stated as follows:

"RETALIATORY DISCHARGE ISSUES

The issues to be decided by you are as follows:

The plaintiff claims that he was an employee of the defendant from September 1988 until November 22, 2016.

31

The plaintiff claims that while employed by defendant he reported Medicare and Medicaid fraud and abuse.

The plaintiff further claims that the reason stated above was a proximate cause of his firing and of his claimed damages.

The defendant denies that the plaintiff was fired for the reason he claims.

The defendant claims that plaintiff was fired for lack of leadership in certain areas, including personnel management."

The following colloquy regarding the instruction occurred:

"THE COURT: No. 2 is IPI 250.01, Issues with regard to retaliatory discharge. This appears to be straight out of the IPI. Any objection?

MS. AUSTIN [(PLAINTIFF'S ATTORNEY)]: This one we have worked together with defendant to merge. There are some parts of this that are kind of fill in the blank and we've sort of agreed to each other's language on certain parts.

THE COURT: So the submission that will be submitted—the instruction that will be submitted on Monday morning is agreed, is that correct, Shari [(defendant's attorney)]?

MS. RHODE [(DEFENDANT'S ATTORNEY)]: Yes, ma'am.

THE COURT: All right. So 250.01 will be No. 2 and *** will be given by agreement."

¶ 124 Plaintiff's Instruction 3 was based on the Illinois Pattern Jury Instructions, Civil, No. 250.02 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 250.02), and stated as follows:

"RETALIATORY DISCHARGE BURDEN OF PROOF

The plaintiff has the burden of proving each of the following propositions:

First, that the plaintiff was an employee of the defendant;

32

Second, that the plaintiff was fired from his employment with the defendant:

Third, that the plaintiff was fired because he reported Medicare and Medicaid fraud and abuse;

Fourth, that the plaintiff sustained damages as a result of his firing; and

Fifth, that the reason stated above was a proximate cause of his firing and resulting damages.

Defendant admits that plaintiff was an employee of defendant and that he was discharged. If you find from your consideration of all the evidence that the third, fourth, and fifth of the above propositions have been proven, your verdict should be for the plaintiff. If, on the other hand, you find from your consideration of all the evidence that the third, fourth, and fifth of these propositions has not been proven, your verdict should be for the defendant."

SIH objected to this instruction, and the following discussion occurred:

"THE COURT: No. 3 is 250.02, any changes to this?

MS. AUSTIN: This is the same as the previous one, we've agreed to some language. We did have one—I believe you had one—

MS. RHODE: I had one objection, [Y]our Honor, the question the Court resolved. This sets out whether the plaintiff has to prove—and it's our proposition he has to prove that he was discharged for the proximate cause not a proximate cause. Certainly I understand the two that he's alleging it's a—

MS. AUSTIN: Your Honor—I'm sorry, I didn't mean to interrupt you, I thought you were done.

MS. RHODE: And I do have some case cites from the common law and that was provided to the Court, I think it's 'the' not 'a,' but other than that, we have no disagreement.

THE COURT: The IPI says this: 'That the reasons stated in the paragraphs above was/were a proximate cause of his or her discharge resulting in damages.'

MS. RHODE; Yes, [Y]our Honor, but the comment—the case law and common law—because, again, the IPI instruction deals with retaliatory discharge, it's more statutory, but the case law has said it's 'the' reason. I just want to make the record.

THE COURT: Well, the IPI, for the record, it's 250.02, it is labeled or titled 'Retaliatory Discharge, Burden of Proof on the Issues. One plaintiff, one defendant.' That's exactly what we have here so the Court is going to follow the IPI. And '[N]otes on [U]se: This instruction should be given with the issues instruction on [R]etaliatory [D]ischarge.'

So the Court is going to give the IPI. So shall I note your objection to Plaintiff's No. 3?

MS. RHODE: That's fine. Thank you.

THE COURT: So it will be given over objection with regard to a cause and we'll put that—Well, it's on the record, okay. So that's No. 3."

¶ 125   Defendant's Instruction 6 was a non-IPI instruction. It stated, "When deciding the element of causation, the ultimate issue is the employer's motives in discharging the employee." This instruction was based on *Michael v. Precision Alliance Group, LLC*, 2014 IL 117376, ¶ 31. The instruction was given without objection.

¶ 126   The next day of trial, a final jury instruction conference was held. At that time, SIH repeated its objection to Plaintiff's Instruction 3, based on IPI Civil No. 250.02. The objection was again to the use of "a" proximate cause instead of "the" proximate cause.

¶ 127   The parties gave their closing arguments, the jury was instructed, and retired to deliberate. The jury returned a verdict for Kaytor and awarded the following damages: economic loss—$291,251; emotional distress—$250,000; and punitive damages—$3 million. Judgment entered in favor of Kaytor and against SIH in the amount of $3,541,251 on February 8, 2023.

¶ 128   SIH filed a posttrial motion seeking an arrest of judgment or, in the alternative, a new trial. The posttrial motion argued four points: (1) SIH was unduly prejudiced and deprived of a fair trial by the use of a jury instruction which misstated the standard of causation, specifically Instruction 3 based on IPI Civil No. 250.02; (2) SIH was unduly prejudiced and deprived of a fair trial by the exclusion of witnesses McMillan, Rushing, and Cullum; (3) Kaytor was not entitled to damages for emotional distress; and (4) Kaytor was not entitled to punitive damages, and to the extent such damages are available, the amount awarded was excessive. Kaytor filed a memorandum in opposition to the posttrial motion. SIH obtained leave to file a reply in support of its posttrial motion and requested oral argument on the motion. The matter was set for oral argument; however, the record does not reveal if the hearing occurred, as there were several motions to continue filed and a transcript of a hearing on the posttrial motion is not included as part of the record on appeal. The trial court entered an order denying the posttrial motion in its entirety on February 21, 2024. This appeal followed. Additional facts will be set forth in the analysis, if necessary.

¶ 129                                II. ANALYSIS

¶ 130   On appeal, SIH argues four main issues. First, that Kaytor was not entitled to punitive damages or, alternatively, if punitive damages were recoverable, the amount awarded was excessive and should be remitted. Second, Kaytor was not entitled to damages for emotional distress. Third, that SIH was unduly prejudiced and deprived of a fair trial by the giving of a jury

instruction that misstated the standard for causation. Finally, that SIH was unduly prejudiced by the exclusion of three witnesses from testifying.

¶ 131                                    A. Punitive Damages

¶ 132   On appeal, SIH contends there were multiple errors regarding punitive damages. First, SIH argues that the trial court erred in allowing Kaytor to seek punitive damages based on the facts of the case. Next, SIH argues the jury's decision to award punitive damages was erroneous. Finally, SIH argues the jury's award of $3 million was excessive and violated its due process rights. Before examining each of these issues, it is necessary to discuss the various standards of review applicable to cases with a jury trial and punitive damages.

¶ 133   Our colleagues in the Second District set forth the five steps of punitive damages in a jury trial and the applicable standards of review in *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138-40 (2004). The first step is to determine whether punitive damages are an available remedy for the cause of action; this step is reviewed *de novo*. *Id.* at 1138. Once the trial court determines punitive damages are an available remedy, the second step is to determine if the issue of punitive damages should be submitted to the jury. *Id.* "[T]he trial court may submit the issue of punitive damages to the jury only if the plaintiff has made out a *prima facie* case for such damages." *Id.* The decision to submit the question of punitive damages to the jury is a matter reserved to the trial court and will not be reversed absent abuse of discretion. *Id.* Next, if the jury finds as a matter of fact that the defendant acted willfully or maliciously, this finding is reviewed under the manifest weight standard. *Id.* Then, the jury determines the amount of punitive damages to award. *Id.* The jury's award of punitive damages will not be reversed unless it is so excessive to indicate passion, partiality, or corruption. *Id.* Finally, after a jury determines an award of

36

punitive damages, "[t]he trial court may, in its discretion, determine whether the jury award for punitive damages is excessive and, if so, enter a remittitur or a conditional new trial." *Id.* at 1139.

¶ 134   In its brief, SIH argues that *de novo* review should be applied to determine whether the facts of this case justify the imposition of punitive damages. Based on the foregoing, we disagree. In this case, there is no allegation that the remedy of punitive damages is unavailable as a matter of law in common law retaliatory discharge cases. Accordingly, step one of the punitive damages analysis, which would be subject to *de novo* review, does not apply. *Id.* at 1138.

¶ 135   Turning to the second step, SIH argues that the facts of this case did not warrant submitting the issue of punitive damages to the jury. As set forth above, if the trial court determines the plaintiff has made a *prima facie* case for punitive damages and to submit the question of punitive damages to the jury, this is reviewed for an abuse of discretion. *Id.* "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court [citations]." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). Kaytor's original complaint, filed on March 23, 2018, contained a prayer for punitive damages, as did his amended complaint filed on June 25, 2018. Kaytor's amended complaint alleged, *inter alia*, he was terminated due to reporting suspected Medicaid and Medicare fraud and "[t]he conduct of Defendant SIH was outrageous because it was undertaken with evil motive and reckless disregard for Plaintiff's rights." A review of the common law record and the report of proceedings, which contains only the trial transcript, reveals that SIH did not object to submitting the issue of punitive damages to the jury. SIH did not file a motion to strike or dismiss Kaytor's request for punitive damages, did not object to plaintiff's jury Instruction 8 on punitive damages, nor object to including punitive damages on the plaintiff's verdict form. Based on Kaytor's allegation that SIH acted with "reckless disregard" and "evil motive" when

terminating him, it was not an abuse of the trial court's discretion to submit the issue of punitive damages to the jury.

¶ 136 Next, we turn to SIH's argument that the jury's decision to award punitive damages was against the manifest weight of the evidence. In order to award punitive damages, the jury was first required to make a factual finding that SIH's conduct was willful and wanton and proximately caused damage to Kaytor. In this case, the jury was instructed that "willful and wanton" conduct meant "a course of action which shows actual or deliberate intention to harm, or which, if not intentional, shows an utter indifference or conscious disregard for a person's rights." The jury returned a verdict in favor of Kaytor with an award for punitive damages; thus, the jury found that SIH's conduct warranted the imposition of punitive damages. SIH contends the evidence was insufficient for the jury to find the conduct warranted the imposition of punitive damages.

¶ 137 We review the jury's finding under the manifest weight of the evidence standard. *Franz*, 352 Ill. App. 3d at 1138. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). When applying the manifest weight standard, we give deference to the finder of fact—in this case, the jury—because it was in the best position to observe the conduct and demeanor of the parties and witnesses. *Id.* at 350-51.

¶ 138 We have reviewed the lengthy trial testimony in this case, and recounted relevant portions in the background above. Having considered the evidence presented, we cannot find that the opposite conclusion was clearly evident or the finding was unreasonable, arbitrary, or not based on the evidence. The jury was presented with testimony from Kaytor regarding his reports to his supervisor and the compliance department regarding what he believed to be violations of Medicare and Medicaid regulations. Other witnesses corroborated Kaytor's testimony. Sufficient evidence

38

was presented to the jury for it to find that SIH's conduct was willful and wanton and damaged Kaytor.

¶ 139   Next, SIH argues the award of $3 million in punitive damages was excessive and the trial court erred when it refused to remit the award. This is reviewed under the abuse of discretion standard. *Franz*, 352 Ill. App. 3d at 1139. SIH's posttrial motion argued that in the cases of *Slovinski v. Elliot*, 237 Ill. 2d 51 (2010), and *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, the jury's punitive damages awards were reduced by the trial court. The same argument was repeated, almost verbatim, in SIH's brief before this court on this issue.

¶ 140   *Slovinski* involved defamation. After an employee was terminated, his former employer made disparaging comments regarding him in a meeting with a supplier. *Slovinski*, 237 Ill. 2d at 54-55. The matter proceeded to a jury trial and the plaintiff was awarded $0 for lost wages, $0 for damage to reputation, $81,600 for emotional damages, and $2 million in punitive damages. *Id.* at 57. The trial court reduced the punitive damage award to $1 million. *Id.* On appeal, the Illinois Supreme Court reduced the punitive damage award to $81,600. *Id.* at 65. In doing so, the Supreme Court found that plaintiff argued there was a premeditated scheme to defame him; however, there was no material evidence presented to support this claim. *Id.*

¶ 141   *Lawlor* involved a claim against her former employer for intrusion on seclusion after she separated from the employer. Intrusion on seclusion is a type of tort for the invasion of privacy, such as some form of investigation or examination into the person's private concerns. *Lawlor*, 2012 IL 112530, ¶ 33. One of the allegations was that the former employer commissioned an investigation into plaintiff through an investigator who pretended to be the plaintiff to obtain her private phone records. The supreme court noted this case was similar to *Slovinski*, in that there was no evidence of an intentional, premeditated scheme, and there was no animus toward plaintiff by

39

the investigator. *Id.* ¶ 62. Accordingly, the supreme court reduced the punitive damage award to the same amount of compensatory damages awarded to plaintiff, $65,000. *Id.* ¶ 76.

¶ 142 SIH, in its posttrial motion and in its brief before this court, cites to *Slovinski* and *Lawlor*, but does not argue what each of those cases ultimately relied upon; the lack of material evidence of an intentional, premeditated scheme; or the lack of animus toward Kaytor. Further, the trial court's written order denying the posttrial motion was thoughtful and well-written. As to the request for remittitur, the trial court noted the "jury's assessment of punitive damages will be reversed only when the manifest weight of the evidence shows that its assessment was so excessive as to demonstrate passion, partiality, or corruption on the jury's part." *McQueen v. Green*, 2022 IL 126666, ¶ 58. The trial court noted Kaytor's requested damages were significantly higher, by approximately $1.8 million, than those awarded by the jury. The trial court relied upon *Northern Trust Co. v. County of Cook*, 135 Ill. App. 3d 329, 335-36 (1985), and found when the award from the jury was reduced from the requested award, there is no indication the jury could have been inflamed by passion, partiality, or corruption in favor of the plaintiff.

¶ 143 The trial court also conducted a common law analysis that, although not exhaustive, includes "the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant." *Deal v. Byford*, 127 Ill. 2d 192, 204 (1989). The trial court noted, regarding the financial status of the defendant, that the punitive damage award of $3 million was only 6% of SIH's annual profit of $46 million. Following these considerations, the trial court denied to remit the punitive damage award or order a conditional new trial. This decision is reviewed for an abuse of discretion. *Franz*, 352 Ill. App. 3d at 1139. We cannot find that the trial court's denial of the motion for remittitur of the punitive damages award or the motion for a

conditional new trial was arbitrary, fanciful, or unreasonable or that no reasonable person would agree with the position adopted by the trial court.

¶ 144   Finally, SIH argues that the punitive damages award of $3 million violates its due process rights under the fourteenth amendment to the United States Constitution. This is reviewed *de novo*. *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 469 (2006).

¶ 145   The United States Supreme Court has identified three guideposts for determining whether a punitive damage award comports with due process: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418 (2003). The Court noted "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996). To determine the reprehensibility of a defendant, we are to consider whether the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 576-77. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419.

¶ 146  SIH contends Kaytor's harm was economic, rather than physical, and, thus, there was also no disregard for the safety or health of others. SIH also argues that the alleged improper conduct was a single act of terminating Kaytor, and there was no evidence of intentional malice, trickery, or deceit.

¶ 147  The first guidepost, the degree of reprehensibility of the defendant's misconduct, consists of five factors. *Gore*, 517 U.S. at 576-77. As to the first and second factors, physical as opposed to economic harm and indifference or reckless disregard for the health or safety of others, Kaytor testified he suffered from emotional distress following his termination, and the jury found this testimony credible and awarded him damages for emotional distress. Psychological harm—such as anxiety, distress, and sleeplessness—is a form of injury that satisfies the first two factors of the reprehensibility analysis. *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 259. As to the third factor, Kaytor was financially vulnerable. Kaytor relied upon his employment income to support himself and lost this stability when he was terminated. Regarding the fourth factor, a repeated pattern of behavior or an isolated incident, "we may consider the defendant's conduct toward the plaintiff as well as the defendant's related conduct toward other parties." *Blount v. Stroud*, 395 Ill. App. 3d 8, 25 (2009). Based on the testimony, there was evidence that SIH knowingly allowed retaliation against Kaytor and other employees who called attention to what they believed to be unlawful conduct.

¶ 148  As to the fifth factor, intentional malice, while there was no direct testimony that the termination was the result of intentional malice, trickery, or deceit, there was sufficient circumstantial evidence presented that could lead a reasonable person to determine Odle, as an agent of SIH, acted in a way that would support a finding of intentional malice.

¶ 149   Turning to the second guidepost, we review the disparity, or ratio, between the amount of compensatory damages awarded and the amount of punitive damages. *Gore*, 517 U.S. at 582. SIH's argument on this guidepost, in both its posttrial motion and appellate brief, does not set forth how the ratio between the compensatory damages and the punitive damages in this case results in a finding the punitive damage award was excessive. Rather, SIH contends "[a]n award here in line with those in *Slovinski* and *Lawlor*, a ration of one-to-one with compensatory damages, is appropriate here."

¶ 150   Kaytor's brief argues that the ratio in this case is reasonable and similar to other punitive damages awards that have been affirmed. In *Gore*, the amount of punitive damages awarded was 500 times the amount of compensatory damages awarded by the jury. *Id.* In the present case, the punitive damages award of $3 million is 5.5 times the amount of the compensatory damages award of $541,251. This court, in *Holland*, affirmed the same ratio of 5.5 and found the ratio was not excessive. *Holland*, 2013 IL App (5th) 110560, ¶ 260. In *Mook v. Johnson*, 2018 IL App 3d 170229, ¶ 31, the ratio of 5.66 was affirmed. Further, the *Mook* court noted "that punitive damage awards in single-digit multipliers generally comport with due process." *Id.* Under the facts of this case and consistent with prior decisions, we cannot hold that the ratio of 5.5 between punitive damages and compensatory damages is excessive.

¶ 151   The third *Gore* guidepost is the comparison between the punitive damages award and civil penalties for analogous misconduct. *Gore*, 517 U.S. at 583. Kaytor's brief noted that no directly comparable penalties exist for retaliatory discharge in violation of public policy. In this instance, it is useful to review punitive damages awarded in similar cases as a basis for comparison. *Blount*, 395 Ill. App. 3d at 30. The $3 million punitive damages award in this case is in line with the punitive damages awarded in three other retaliatory discharge cases: $2 million in *Crowley v.*

*Watson*, 2016 IL App (1st) 142847, ¶ 51; $3.6 million in *Holland*, 2013 IL App (5th) 110560, ¶ 252; and $2.8 million in *Blount*, 395 Ill. App. 3d 27.

¶ 152   Based upon our *de novo* review of this matter and the *Gore* factors, we find the $3 million punitive damages award was not excessive and comports with due process.

¶ 153                                                 B. Emotional Damages

¶ 154   In its posttrial motion, SIH asked the trial court for an order in arrest of judgment because Kaytor was awarded damages for emotional distress without having pleaded a cause of action for intentional infliction of emotional distress. Alternatively, SIH requested a judgment notwithstanding the verdict (judgment *n.o.v.*) or a new trial. "[A]n arrest of judgment is proper when a court rules upon the sufficiency of a plaintiff's complaint after the entry of a judgment in a plaintiff's favor, and a judgment notwithstanding the verdict is designed to question the adequacy of the proofs or other issues raised at trial." *Rhodes v. Uniroyal, Inc.*, 101 Ill. App. 3d 328, 331 (1981). The standard of review for the denial of a motion in arrest of judgment and for a judgment *n.o.v.* are the same; *de novo* review applies. *Id.* However, the "standard for obtaining a judgment *n.o.v.* is a very difficult standard to meet, and limited to extreme situations only." (Internal quotation marks omitted.) *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 45. This is because it is the province of the jury to resolve conflicts in the evidence, assess credibility, and decide the weight to be given to testimony. *Id.*

¶ 155   As to the motion in arrest of judgment, SIH contends that, in order for Kaytor to have been able to recover emotional damages, he was required to state a cause of action for intentional infliction of emotional distress. Kaytor's complaint did not set forth a claim for intentional infliction of emotional distress.

44

¶ 156   SIH's brief asserts, without citation to legal authority, that "[i]ntentional infliction of emotional distress is a cause of action ancillary to a retaliatory discharge claim, rather than an element of damages for the discharge itself." SIH cites to cases where plaintiffs have chosen to state a cause of action for intentional or negligent emotional distress in addition to their claim for retaliatory discharge; however, there is nothing that requires this. The "plaintiff is the master of his complaint, thereby free to choose his own theory of liability so long as the evidence supports it." *Keeley & Sons, Inc. v. Zurich American Insurance Co.*, 409 Ill. App. 3d 515, 524 (2011).

¶ 157   The argument that a cause of action for intentional or negligent infliction of emotional distress is required for a plaintiff to recover for emotional damages in a claim for retaliatory discharge has previously been decided by this court in *Sloan v. Jasper County Community Unit School District No. 1*, 167 Ill. App. 3d 867, 869-70 (1988).

¶ 158   In *Sloan*, the plaintiff's complaint alleged the defendant's decision not to renew his contract caused him to suffer not only loss of employment and income, but also " 'stress, pain, suffering, embarrassment and humiliation.' " *Id.* at 869. The defendant argued, and the trial court agreed, that the emotional distress set forth in plaintiff's complaint was "really an element of the separate tort of 'intentional infliction of emotional distress' which should have been pleaded in a separate count." *Id.* On appeal in *Sloan*, this court disagreed with the contention that a separate tort for emotional damages was required for retaliatory discharge cases. "Pain, suffering, embarrassment and humiliation are simply among the elements of damage plaintiff claims to have suffered as a result of the retaliatory discharge ***." *Id.* at 870. "[W]e know of no reason why the type of damages available in retaliatory discharge cases should be more limited than those available in any other tort actions." *Id.* Further, there are several Illinois retaliatory discharge cases since *Sloan* where a plaintiff has recovered for emotional distress without pleading a separate cause of action

45

of either intentional infliction of emotional distress or negligent infliction of emotional distress. See *Davis v. City of Chicago*, 2020 IL App (1st) 182551-U; *Young*, 2015 IL App (1st) 131887; *Reinneck v. Taco Bell Corp.*, 297 Ill. App. 3d 211 (1998); *Kritzen v. Flender Corp.*, 226 Ill. App. 3d 541 (1992).

¶ 159   Based on the foregoing, there was no requirement for Kaytor's complaint to contain a separate cause of action for intentional infliction of emotional distress. Accordingly, the trial court did not err in denying SIH's motion for arrest of judgment.

¶ 160   SIH's alternative argument regarding emotional damages was that a judgment *n.o.v.* should be ordered because Kaytor did not produce evidence at trial that he was hospitalized or otherwise treated for any emotional distress. This argument has also been previously decided by this court in *Clark v. Owens-Brockway Glass Container, Inc.*, 297 Ill. App. 3d 694, 701 (1998). In *Clark*, the plaintiff brought a claim for retaliatory discharge, and she offered the only testimony regarding her emotional distress following her discharge. *Id.* We held:

> "The existence or nonexistence of medical testimony goes to the weight of the evidence but does not prevent this issue from being submitted to the jury. [Citation.] Expert, or medical, testimony is not needed to prove things that are common knowledge. Any average, reasonable person can readily evaluate a claim of emotional distress alleged to result from a discharge and loss of earnings." *Id.*

¶ 161   In the present case, Kaytor testified regarding his former love for his job and how the termination affected him. Draper also testified regarding her observations of Kaytor following his termination. This evidence was sufficient for the jury to evaluate Kaytor's claim for emotional damages. Accordingly, the trial court did not err in denying the motion for a judgment *n.o.v.* or new trial.

46

¶ 162                                    C. Jury Instructions

¶ 163    SIH argues it is entitled to a new trial because the jury was not properly instructed on the

burden of causation. Specifically, SIH contends that Plaintiff's Instruction 3, which was based on

IPI Civil No. 250.02, misstated the standard for causation in a retaliatory discharge case because

it stated, "was a proximate cause" rather than "the proximate cause." A trial court's decision to

grant or deny a jury instruction is generally reviewed for an abuse of discretion. *Bailey v. Mercy*

*Hospital & Medical Center*, 2021 IL 126748, ¶ 42. "The standard for determining an abuse of

discretion is whether, taken as a whole, the instructions are sufficiently clear so as to not mislead

and whether they fairly and correctly state the law." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483,

505 (2002). We review *de novo* the legal question of whether the instruction accurately conveyed

the applicable law. *Bailey*, 2021 IL 126748, ¶ 42.

¶ 164    Illinois Supreme Court Rule 239(a) requires that

> "[w]henever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction
>
> applicable in a civil case, giving due consideration to the facts and the prevailing
>
> law, and the court determines that the jury should be instructed on the subject, the
>
> IPI instruction shall be used, unless the court determines that it does not accurately
>
> state the law." Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013).

¶ 165    IPI Civil No. 250.02 provides:

> "250.02 Retaliatory Discharge Burden of Proof on the Issues—One Plaintiff, One
>
> Defendant
>
> The plaintiff has the burden of proving each of the following propositions:
>
> First, that the plaintiff was an employee of the defendant;

47

Second, that the plaintiff was [discharged] [fired] from [his] [her] employment with the defendant;

Third, that the plaintiff was [discharged] [fired] because [*set forth in simple form without undue emphasis or repetition the plaintiff's claimed reason(s) for the discharge*];

Fourth, that the plaintiff sustained damages as a result of [his] [her] [discharge] or [firing];

Fifth, that the reason(s) stated in paragraph ['Third'] above [was] [were] a proximate cause of [his] [her] [discharge] [firing] and resulting damages.

If you find from your consideration of all the evidence that each of these propositions has been proven, then your verdict should be for the plaintiff. On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proven, then your verdict should be for the defendant." IPI Civil No. 250.02.

¶ 166 " 'In Illinois, in order to establish a tort claim for retaliatory discharge, a plaintiff must show (1) that [the plaintiff] has been discharged; (2) in retaliation for [his or her] activities; and (3) that the discharge violates a clear mandate of public policy.' " *Rehfield v. Diocese of Joliet*, 2021 IL 125656, ¶ 27 (quoting *Bajalo v. Northwestern University*, 369 Ill. App. 3d 576, 580 (2006)). "Concerning the element of causation, the ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 163 (1992).

¶ 167 On appeal, SIH argues that IPI Civil No. 250.02 misstates the burden of proof regarding causation because the use of "a" instead of "the" could allow a jury to decide a "mixed motive" led to the discharge of the employee. SIH points to *Hartlein* and *Thompson v. Abbott Laboratories*, 193 Ill. App. 3d 188 (1990), to support its argument.

48

¶ 168   In *Hartlein*, there was no issue regarding jury instructions for the court to consider. This case is cited in SIH's brief only to set forth the elements of the cause of action of retaliatory discharge and to assert that the ultimate issue is the employer's motive.

¶ 169   In *Thompson*, the plaintiff proposed non-IPI jury instructions that set forth a "mixed motive." Thompson's proposed "mixed-motives instructions instructed the jury that there could be more than one factor or cause for plaintiff's discharge and that, if one of the factors was pursuit of her worker's compensation claim, plaintiff was entitled to recover." *Id.* at 196. The *Thompson* trial court refused to give the non-IPI "mixed motive" instructions, which was affirmed on appeal. On appeal, the *Thompson* court noted that

> "[a]lthough a few jurisdictions have adopted the mixed-motive theory in determining the outcome of worker's compensation cases, Illinois has thus far not addressed the issue. Moreover, we need not address it here, as the evidence clearly showed that plaintiff's filing of her worker's compensation claim was not a factor or motive in her termination." *Id.* at 197.

Thus, there was no evaluation of an IPI instruction in *Thompson*.

¶ 170   This court, in *Holland*, has previously evaluated whether IPI Civil No. 250.01 and IPI Civil No. 250.02 accurately conveyed the applicable law and found they did. *Holland*, 2013 IL App (5th) 110560, ¶ 151. In *Holland*, we found,

> "the jury instructions informed the jury that [plaintiff] was required to prove that exercising his rights under the Workers' Compensation Act was 'a proximate cause of his firing.' The instructions further defined 'proximate cause' as 'a cause that, in the natural or ordinary course of events, *produced* the plaintiff's injury.' (Emphasis added.) Accordingly, the jury instructions correctly directed the jury to find liability only if [plaintiff] proved that he was

49

fired for exercising his rights under the Workers' Compensation Act. The instructions' requirement that [plaintiff's] workers' compensation claim must have 'produced' his discharge limited the jury to finding liability only if [plaintiff] proved that he was terminated for exercising his rights under the Workers' Compensation Act. The jury instructions were consistent with traditional tort analysis and fairly, fully, and comprehensively informed the jury concerning the legal principles relevant to [plaintiff's] burden of proof and the elements of his claim." *Id.*

¶ 171 In the present matter, like in *Holland*, the jury was given IPI Civil No. 250.01, without objection by SIH; IPI Civil No. 250.02; and the "short form" version of Illinois Pattern Jury Instructions, Civil, No. 15.01 (rev. Aug. 2021) (hereinafter IPI Civil No. 15.01), without objection, which defined proximate cause. The jury was instructed, "[w]hen I use the expression 'proximate cause,' " I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury." Plaintiff's Instruction 3, IPI Civil No. 250.02, is still an accurate statement of the law. Moreover, Defendant's Instruction 6, a non-IPI instruction, was given to the jury. It stated, "[w]hen deciding the element of causation, the ultimate issue is the employer's motives in discharging the employee." SIH also contends *Holland* stands for the proposition that a mixed motive allows for recovery; however, based on the plain language in *Holland*, this is not the case. Accordingly, the Illinois Supreme Court case of *Michael*, is not applicable to the *Holland* case. Both *Holland* and *Michael* find that the plaintiff must prove they were discharged in retaliation for their protected activity. *Michael*, 2014 IL 117376, ¶ 36; *Holland*, 2013 IL App (5th) 110560, ¶ 151.

¶ 172                                      D. Witnesses

¶ 173 In its posttrial motion, SIH requested a new trial based upon a discovery sanction that resulted in the exclusion of three of its witnesses from testifying. The decision to grant a new trial

50

based on evidentiary objections is within the trial court's broad discretion. *Bartlett Bank & Trust Co. v. McJunkins*, 147 Ill. App. 3d 52, 63 (1986). "[T]he exercise of [that discretion] will not be disturbed absent clear abuse of that discretion." *Id.* Further, the imposition of sanctions pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) is within the discretion of the trial court. The court's decision in fashioning a sanction will not be disturbed, absent a clear abuse of discretion. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 620-21 (2007).

¶ 174 SIH contends McMillan, Rushing, and Cullum would have testified to a valid and legitimate, nondiscriminatory business reason for Kaytor's termination. They urge that the exclusion of these witnesses was too harsh a sanction, so a new trial is warranted. Kaytor objected to these witnesses testifying at trial because they were disclosed as witnesses only a week prior to trial.

¶ 175 Kaytor propounded Illinois Supreme Court Rule 213 (Jan. 1, 2018) interrogatories to SIH in 2018. On October 4, 2018, SIH, through its counsel, responded to the interrogatories. Interrogatory No. 3 was answered, *inter alia*, as follows:

"3. 'Identify' each person to [*sic*] who has personal knowledge or information relating to Plaintiff's claims, Defendant's defenses, or Defendant's affirmative defenses in this matter, state the substance of the person's knowledge; last known address; and last known mobile and landline phone numbers.

ANSWER: Defendant objects to Interrogatory No. 3 on the basis that the request to identify 'each' person who may have personal knowledge or information relating to Plaintiff's claims, Defendant's defenses, or Defendant's affirmative defenses is overly broad and unduly burdensome. Without waiving its objection, Defendant states as follows:

Susan Odle—***

51

Plaintiff (Kevin Kaytor)—***

Donna Draper—***

Kelly Stevens—***

Pamela Henderson—***

Emily Reiman—***

All of the foregoing individuals may be contacted through Defendant's counsel.

James McMillan, Sleep Educator—Mr. McMillan can testify about Plaintiff's leadership by fear and intimidation; special treatment of Donna Draper; and the abrasive relationship between Plaintiff and the Medical Director.

Page Rushing, Sleep Tech—Ms. Rushing can testify about Plaintiff's leadership by fear and intimidation; special treatment of Donna Draper; and the abrasive relationship between Plaintiff and the Medical Director.

Terry Woodfall—***

Dave Cullum, Sleep Tech—Mr. Woodfall can testify about Plaintiff's leadership by fear and intimidation; special treatment of Donna Draper; and the abrasive relationship between Plaintiff and the Medical Director.

Judy Elmore—***"

Kaytor's Interrogatory No. 6 was propounded pursuant to Illinois Supreme Court Rule 213(f)(1)-(3) (eff. Jan. 1, 2018) and requested the identification of all witnesses defendant may call at trial. When SIH answered this interrogatory in October 2018, it listed the following Rule 213(f)(1) witnesses: Susan Odle, Plaintiff, Donna Draper, Kelly Stevens, Pamela Henderson, and Emily Reiman. The answer to Plaintiff's Interrogatory No. 6 was not supplemented to include McMillan, Rushing, and/or Cullum. SIH first listed McMillan, Rushing, and Cullum as witnesses on January

12, 2023, which was 11 days prior to the start of trial and 20 days after discovery had closed pursuant to a discovery order.

¶ 176   In determining whether the exclusion of a witness is a proper sanction for nondisclosure, the trial court must consider (1) the surprise to the adverse party, (2) the prejudicial effect of the witness' testimony, (3) the nature of the testimony, (4) the diligence of the adverse party, (5) the timeliness of the objection, and (6) the good faith of the party seeking to offer the testimony. *Nedzvekas*, 374 Ill. App. 3d at 621. No single factor is dispositive, and each case presents a unique factual situation that must be taken into consideration when determining if a particular sanction is proper. *Id.*

¶ 177   Once SIH listed McMillan, Rushing, and Cullum as witnesses, Kaytor filed a written objection. SIH filed a written response. Based upon the trial court's order on this issue and information provided in briefing, argument was held on Kaytor's objection to these witnesses at the final pretrial hearing. However, there was no transcript or by-stander's report filed regarding this hearing. SIH, as the appellant,

> "has the burden of presenting a sufficiently complete record of the proceedings at trial to support a claim of error [citations], and, in the absence of such a record on appeal, the reviewing court will presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis." *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003).

¶ 178   In the present case, we were not provided with a record of the hearing on this issue. The information available from the common law record reveals that McMillan, Rushing, and Cullum were listed as individuals who may have knowledge regarding the claims. When they were identified, they were not identified as being controlled by SIH, and no contact information was

53

provided for these individuals. When this issue was presented to the trial court in SIH's posttrial motion, the trial court conducted a thorough analysis setting forth the reasons for the sanction and the denial of a new trial. Based on the information provided to us by the appellant, we cannot find that the trial court abused its discretion in excluding McMillan, Rushing, and Cullum as witnesses at trial or in denying the motion for a new trial based on their exclusion.

¶ 179                                III. CONCLUSION

¶ 180   For the foregoing reasons, we affirm the judgment in favor of Kaytor and against SIH.

¶ 181   Affirmed.

*Kaytor v. Southern Illinois Hospital Services*, 2025 IL App (5th) 240416

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Jackson County, No. 18-L-31; the Hon. Christy W. Solverson, Judge, presiding. |
| **Attorneys for Appellant:** | Timothy J. Gearin, David G. Ott, Donald M. Flack, and Nicolas P. Cejas, of Armstrong Teasdale LLP, of St. Louis, Missouri, for appellant. |
| **Attorneys for Appellee:** | John D. Lynn, Erin E. Austin, Mary Anne Sedey, and Jessica M. Scales, of Sedey Harper Westhoff, P.C., of St. Louis, Missouri, for appellee. |