NOTICE
Decision filed 12/09/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231154-U

NO. 5-23-1154

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| JOSEPH MURRAY and MICHELLE KIOUS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 22-LA-648 |
| | ) | |
| SALLY ABRAHAM, | ) | Honorable |
| | ) | Christopher T. Kolker, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Cates and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the court's compensatory and punitive damage awards where defendant either forfeited or failed to provide supporting authority for her arguments.

¶ 2    Defendant, Sally Abraham, appeals the court's August 15, 2023, order entering compensatory and punitive damage awards against her, and the court's October 23, 2023, order denying Sally's amended posttrial motion. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Plaintiffs Joseph Murray and Michelle Kious were in a romantic relationship and the tenants of Sally Abraham's property on 224 Gettysburg Drive, Apartment D, Belleville, Illinois (apartment). On July 29, 2022, Plaintiffs Joseph Murray and Michelle Kious filed a three-count complaint against defendant, Sally Abraham.

1

¶ 5    Count I of the complaint alleged violations of section 3604 of the Fair Housing Act (Act) (42 U.S.C. § 3601 *et seq.* (West 2020)) based on Sally demanding sex from Joseph as a *quid pro quo* for his continued tenancy at the apartment, demanding Michelle to leave because she was a woman who dated Joseph, and attempting to evict both plaintiffs when they refused her demands. Count II alleged violations of section 3617 of the Act (*id.* § 3617) based on Sally breaking into plaintiffs' home and stealing or destroying property, threatening to evict plaintiffs, and demanding plaintiffs end their relationship. For both counts I and II, plaintiffs asserted that pursuant to section 3613 of the Act (*id.* § 3613), plaintiffs were entitled to actual damages, punitive damages, court costs, and attorney fees. They also requested judgment in the amount not less than $100,000, plus costs and attorney fees and any other relief deemed appropriate, for each count.

¶ 6    The third count alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2020)) based on Sally's unfair, oppressive and unconscionable conduct. Plaintiffs again requested judgment of not less than $100,000, plus costs, attorney fees, and whatever additional relief the court deemed appropriate.

¶ 7    Throughout the proceedings, Sally was *pro se*. The court found that she failed to file an appropriate answer to plaintiffs' complaint and continuously failed to file proper responses to plaintiffs' discovery requests. As a result of her conduct, the court deemed the facts in the complaint admitted and granted plaintiffs' request, pursuant to Illinois Supreme Court Rule 216 (eff. July 1, 2015), to admit facts.

¶ 8    Consequently, the following facts from the complaint were admitted. Sally owned the property at 224 Gettysburg Drive, Apartment D, Belleville, Illinois, and was the plaintiffs' landlord. Plaintiffs moved into the apartment on May 15, 2020, and paid $550 per month in rent. Plaintiffs were in a romantic relationship and defendant was jealous. On or about December 26,

2020, Sally began making repeated demands that Joseph leave Michelle and date Sally instead. Sally also demanded sex with Joseph, but Joseph refused her demands and reiterated his love for Michelle. Sally would respond by falsely telling Joseph that Michelle was cheating on him with other tenants in the building. Sally also began sending plaintiffs harassing and threatening text messages on a daily basis. The text messages included Sally calling Michelle expletive names, alleging Michelle cheated on Joseph, and threatening to arrest or evict Michelle. When plaintiffs demanded that Sally no longer send messages, she escalated to threatening to have Michelle arrested for trespassing and demanding that plaintiffs vacate the apartment. On March 3, 2022, Sally texted plaintiffs stating that because Michelle could not get Joseph to cooperate with Sally's demands, she would falsify court documents to evict Michelle. In March and April 2022 Sally began texting plaintiffs messages with Michelle's personal information, including her date of birth and the addresses of her family members. The harassment became so severe that Joseph suffered a heart attack and ended up in the cardiac Intensive Care Unit (ICU). Despite being current on their rent, on or about July 25, 2021, Sally told Michelle that unless she paid the August rent that day, Sally would evict plaintiffs on July 26, 2021. Sally also left a message that she was going to take the opportunity to force Michelle to leave while Joseph was in the ICU.

¶ 9 On or about August 9, 2021, plaintiffs obtained a no contact order of protection against Sally in St. Clair County case No. 2021-OP-0694. In response, Sally broke into plaintiffs' apartment and stole, destroyed, or damaged most or all of Michelle's personal property, including televisions. Sally then offered to return plaintiffs' property if they dropped case No. 2021-OP-0694. When plaintiffs refused, Sally issued a series of false eviction notices to plaintiffs. On or about August 21, 2021, Sally issued a 10-day eviction notice to plaintiffs for unspecified "lease

3

violations." Sally issued another eviction notice because Joseph continued to refuse her advances and continued to send harassing messages up to the date the complaint was filed.

¶ 10    The following facts from the request to admit were also admitted. Sally sent text messages to Joseph indicating that Michelle cheated on Joseph with other tenants and questioning Michelle's ability to sexually satisfy Joseph. Sally further admitted there was an infestation of roaches in the apartment and she refused plaintiffs' rent after the filing of this lawsuit. Sally also made at least one phone call impersonating Michelle, called Bond County government pretending to be Michelle, and took plaintiffs' mail out of their mailbox without permission.

¶ 11    On January 30, 2023, plaintiffs filed a motion to consolidate the instant case with Sally's eviction case against plaintiffs in St. Clair County case No. 2023-EV-53. However, about three and a half months later, the eviction case was dismissed as moot because plaintiffs vacated the apartment on April 17, 2023, and Sally sought no money from them.

¶ 12    During these proceedings, plaintiffs filed a verified petition for temporary restraining order and a renewed verified petition for preliminary injunction and rule to show cause, on August 19, 2022, and November 16, 2022, respectively. The first petition alleged that in retaliation for filing this lawsuit, Sally unlawfully shut off plaintiffs' air conditioning and hot water in an attempt to constructively evict plaintiffs. The second petition alleged that after the court ordered Sally to comply with court rules, Sally called plaintiffs' employers and falsely told them that she was law enforcement investigating plaintiffs and sought information for wage garnishment. The second petition also asserted that Sally began stealing plaintiffs' mail "in attempt to interfere with communications between plaintiffs and undersigned counsel." Both petitions requested the court enjoin Sally from taking any nonjudicial action that resulted in effectively evicting or dispossessing plaintiffs and from refusing to repair the conditions of the apartment, including

4

immediate repair of the air conditioning and hot water. On March 1, 2023, the court granted plaintiffs' petitions for temporary restraining orders.

¶ 13    On May 11, 2023, plaintiffs filed a motion for partial summary judgment regarding Sally's liability under counts I, II, and III of their complaint. Plaintiffs argued that Sally's liability was clear and free from doubt based on the facts deemed admitted.

¶ 14    On June 15, 2023, the court held a hearing on plaintiffs' motion for partial summary judgment. Plaintiffs' counsel argued that the problem for Sally was that the facts of the complaint had been admitted, including that Sally sent the text messages set forth in the complaint. She argued that the text messages were vulgar, referred to her client's genitals and sex life, and had no rational purpose. Counsel contended this evidence met plaintiffs' burden to establish a *prima facie* case under section 3604 of the Act (42 U.S.C. § 3604 (West 2020)) (count I), and because Sally failed to present any evidence of any kind, she could not satisfy the test of proving a nondiscriminatory reason for her actions. Counsel further argued that plaintiffs met their burden regarding section 3617 of the Act (*id*. § 3617) (count II) by Sally's admission that she shut off plaintiffs' water in retaliation for their filing this lawsuit. Counsel also reminded the court of it granting the TRO.

¶ 15    Sally responded that she never sexually harassed anyone and evicted plaintiffs because they did not pay rent for over one and a half years. She also contended that plaintiffs' counsel told her that she could not evict plaintiffs. Sally also stated that she called "the Fair Housing Act"[1] and they said since the property had been sold, they were not investigating anything in relation to this case. She further contended that plaintiffs rejected her $5,000 offer during mediation because they were greedy.

---

[1]The record does not make apparent exactly whom Sally called.

¶ 16    The court determined that plaintiffs met their *prima facie* case of discrimination and Sally did not present a rational basis for her actions. Given the facts deemed admitted, the court found it had no choice but to grant the partial summary judgment as to counts I and II, and it denied partial summary judgment on count III. The court noted that the trial would be on damages only.

¶ 17    On August 15, 2023, the court held the trial on damages. Plaintiffs called Agent Rick Curtis, who was a senior parole agent for the Illinois Department of Corrections (IDOC) and was Joseph's parole agent. In his role, Agent Curtis received phone calls from various people and received several calls from Sally. He stated Sally would identify herself correctly sometimes and sometimes she said she was Michelle. Agent Curtis testified that when Sally called and pretended to be Michelle, it was often related to domestic issues, which he would investigate and discover were untrue. Specifically, Sally alleged physical abuse by Joseph. Agent Curtis agreed that the purpose of Sally's calls was to reincarcerate Joseph. He also agreed that if he had investigated and found Sally's claims to be true, Joseph would have been reincarcerated.

¶ 18    On cross-examination, Agent Curtis stated that he had plenty of messages on his phone and the automated system for IDOC that would show Sally called from her phone number posing as someone else. On redirect examination, Agent Curtis testified that he received upwards of 25 phone calls from Sally over the years.

¶ 19    Joseph testified that he lived in Sally's building for a little over three years. He stated her text messages over the years made him feel "[a] constant level of nervousness, stress, on edge" because of the threatening nature of the messages. Sally threatened him with homelessness if he did not do what she asked, his incarceration due to her false accusations, his fiancé, and his children. Joseph testified that he suffered serious heart problems while being Sally's tenant. At one point, he went into heart failure. He explained that before medical intervention, his heart was

operating at 10% and he coded three times. His doctors instructed him to have no stress. Joseph agreed that Sally visited him at the hospital and knew about his prognosis. At that time, Sally had already continuously sent text messages. Joseph testified that he believed Sally's actions impacted his recovery because he had to constantly worry, especially when he left his home, as she had previously broken into his apartment and stolen or broken everything. Joseph further stated Sally threatened to break into the apartment while plaintiffs slept. Sally also threatened Michelle's life and threatened to have Sally's brother sexually assault Michelle.

¶ 20    Joseph testified that many of Sally's text messages were graphic and sexual in nature. Sally also talked about Michelle's private areas with the other male tenants. Joseph agreed Sally's actions made him extremely angry and helpless because the only other option to remaining in the apartment would be homelessness.

¶ 21    Joseph stated that Sally had turned the air conditioning off. When asked how this impacted his health, Joseph stated, "It stopped my rebuild stage. One of the—one—I would have had to have stayed in the hospital longer. I had to have it a certain temperature because my heart was barely beating." He further said, "the heat is not my friend." When he went to sleep, his heart would beat so slowly that his lungs would fill with water, and he would stop breathing. Joseph had to call Ameren and say there was a gas leak in order for Ameren staff to come to his apartment, open the door that Sally had locked shut, and inspect the problem. The Ameren workers stated the air conditioning unit wires were cut.

¶ 22    Joseph also testified that Sally turned his water off and he had no water for four months. As a result, Michelle would have to carry five-gallon buckets of water to take baths or bring jugs of water to drink and wash the dishes. Joseph stated that the three other tenants discussed what Sally was doing to plaintiffs, and his neighbor Curtis would relay to him the things Sally said about

7

plaintiffs, including that their home was disgusting and they did not pay their bills. Joseph stated that Sally's actions embarrassed him and Curtis had also suffered retaliatory actions from Sally. Joseph stated that Sally also stole their mail, including their income tax checks.

¶ 23    Joseph testified that Agent Curtis advised him to find another place to live but it was difficult to find an appropriate place to live as a felon. He stated he followed the guidelines of his parole and was afraid of going back to prison. Joseph testified that Sally sent messages saying she would make sure Joseph died in prison and that she would lie to law enforcement in an attempt to make that happen. Joseph believed he was not the first person Sally had harassed, and he would not be the last. He thought she had 18 restraining orders issued against her by other people.

¶ 24    Michelle testified that she lived with Joseph at the apartment owned by Sally for two years. Michelle stated she personally observed the impact that Sally's actions had on defendant's recovery. Michelle contended that if Joseph got hot, he could not breathe. When the apartment had no air conditioning, they often slept at separate times so she could keep an eye on him while he slept. Michelle believed if they had not filed this lawsuit, Sally would have killed Joseph. Michelle denied the allegations in Sally's text messages that said Michelle engaged in sexual relations with other tenants. Being accused of that made Michelle feel violated and like she was constantly being watched.

¶ 25    Michelle testified that she felt threatened by Sally's text messages discussing Michelle's birthday, previous addresses, and social media profile. Michelle also feared for her children because she did not know what Sally would do next. She testified that she felt dirty when the water to her unit was shut off. Michelle believed Sally was trying to make her leave Joseph, by threats that he would abuse her and was just using Michelle. Michelle stated that Joseph never mistreated her and she loved him. She testified that Joseph's health was declining. She believed the stress of

8

this case had him on edge, guarded, and constantly worried. Michelle stated that she was afraid of Sally when she lived at the apartment because Sally texted Joseph one time stating that she was going to come inside their apartment and slice Michelle's throat. Michelle said that Sally did come inside the apartment with her key while Michelle was sitting on the couch, but Sally did not have a knife. Michelle testified that she was still afraid of Sally a little bit.

¶ 26    Michelle agreed that Sally had texted Michelle promising to return Michelle's belongings if she dropped the order of protection against Sally. Michelle stated that Sally took Michelle's overnight bag that contained all of her toiletry items. She agreed that Sally's stealing was targeted at her and stated that none of Joseph's stuff was taken. Michelle stated that she never threatened Sally in any way. Upon the court's questioning, Michelle testified that Sally broke into their apartment and stole items when plaintiffs were not present.

¶ 27    Plaintiffs' counsel then called Sally to testify as an adverse witness. Sally stated that plaintiffs were tenants for approximately three years and that there was nothing she would have done differently during their tenancy. She also stated she remained a landlord.

¶ 28    As a defense witness, Sally testified that she had nothing to do with Joseph's health issues and if plaintiffs were scared of her, they should have moved immediately. Sally then stated it was a mistake to rent to plaintiffs and that her insurance company was going to defend her. She contended she would not pay plaintiffs' counsel's fee.

¶ 29    After plaintiffs' counsel declined to cross-examine and Sally rested, the court asked plaintiffs' counsel to clarify the requested damages. Counsel explained that plaintiffs requested $125,000 in compensatory damages for each count and agreed that the compensatory damages would be for mental anguish and pain and suffering. Counsel also stated plaintiffs requested $375,000 per count for punitive damages, noting it is a three to one multiplier.

9

¶ 30    The court recounted the facts deemed admitted. It found Sally was aware Joseph had heart issues and that Joseph was "inflicted with stress." It also noted that Sally cut off plaintiffs' air conditioning and water when Joseph had heart trouble. The court determined Joseph was in constant fear of going to prison due to Sally's false allegations while impersonating someone else. The court also noted Joseph's testimony that Sally had a history of abuse was undisputed and his belief that she would do this to someone else. The court also noted the messages regarding Sally's attempt at a sexual relationship with Joseph, false allegations that Michelle slept with other tenants, threats to slice Michelle's throat, investigation into Michelle's personal information, and threats to unlawfully evict plaintiffs.

¶ 31    The court found in favor of plaintiffs and against Sally in the total amount of $671,330. The court explained it entered judgment in the amount of $125,000 to each plaintiff in compensatory damages "based upon their mental anguish, the stress, the embarrassment, the humility, what they had to go through is more than merited." It found punitive damages warranted based on the heinous nature of the facts of this case, and that Sally had prior instances of some sort of abusive relationship with protective orders entered. The court determined $200,000 to each plaintiff was appropriate for punitive damages.

¶ 32    On September 12, 2023, Eric M. Rhein appeared as counsel on behalf of Sally. Sally's counsel filed a posttrial motion, arguing, *inter alia*, that both the compensatory and punitive damage awards were excessive and not supported by the evidence. Counsel argued that the court failed to consider Joseph's severe credibility problems, noting he was an addict and convicted felon who stayed in Sally's premises long after he claimed to have been severely harassed. He stated that an honest claimant would not want to stay in his harasser's building. The motion contended that not one penny of special damages was proven by a preponderance of the evidence.

¶ 33   On September 12, 2023, plaintiffs filed a response in opposition to defendant's posttrial motion and also moved for sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 18, 2018). Plaintiffs argued that Sally's motion contained no citation to authority and was largely an attack on the court, plaintiffs, and plaintiffs' counsel. They asserted that Sally blatantly misrepresented the facts of the case and only argued that the court should have found her credible. Plaintiffs also contended that Sally and her counsel should be sanctioned for filing a false and frivolous motion.

¶ 34   On September 14, 2023, defense counsel filed a motion for leave to file an amended posttrial motion with an attached amended posttrial motion. The amended motion eliminated some factual allegations and errors not relevant to this appeal, but the amended motion's allegations relevant to this appeal were substantially the same as the initial posttrial motion.

¶ 35   Plaintiffs objected to Sally's motion for leave to file an amended posttrial motion and renewed their motion for Rule 137 sanctions. They argued that the amended motion suffered from the same defects as defense counsel's previous motion.

¶ 36   On October 19, 2023, defense counsel filed a memorandum of law in support of Sally's posttrial motions and motion for leave to file an amended posttrial motion. Counsel again argued that a reasonable person who received the harassment alleged in this case would have moved out or not fought an eviction. Defense counsel reminded the court that Sally was allowed to visit Joseph in the hospital. Counsel also argued that plaintiffs were not entitled to recover punitive damages, and if they were, defendant requested a remittitur on all damage awards. The motion contended that section 2-1115.05 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1115.05 (West 2022)) provided that in nonmedical malpractice cases, punitive damages could not exceed three times the amount awarded for economic damages. He contended that plaintiffs did not prove

11

economic damages at trial and were therefore barred from receiving punitive damages. Counsel further noted that no bodily injury was proven and plaintiffs did not sue for infliction of emotional distress. The memorandum asserted that the damages awarded in this case were not fair and reasonable where there was no direct physical injury and plaintiffs did not seek professional help for any mental anguish. The motion requested the court to reduce the award for compensatory damages from $125,000 per plaintiff to $25,000 per plaintiff. Citing, *Saccameno v. U.S. Bank*, 943 F.3d 1071 (7th Cir. 2019), it also requested the court reduce the punitive to the amount of the compensatory damages awarded.

¶ 37    On October 19, 2023, defense counsel filed a response to plaintiffs' two motions for sanctions. He argued that there were no grounds to sanction him where he only zealously represented his client.

¶ 38    On October 23, 2023, the court granted defense counsel's motion for leave to file an amended posttrial motion but then denied defendant's posttrial motions. The court also denied plaintiffs' motion for sanctions. Sally timely appealed.

¶ 39                                II. ANALYSIS

¶ 40    On appeal, Sally asserts three bases to reverse or reduce the amount of the damages awarded. Before we address each of her arguments, we first address plaintiffs' argument that Sally forfeited her issues by failing to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) and present objections during the trial.

¶ 41    Plaintiffs contend that Sally's brief fails to include citations to the record in the argument section as required by Rule 341(h)(7), and therefore her brief should be stricken and arguments forfeited. Ordinarily, failure to comply with Rule 341 results in the issues on appeal being forfeited. *People v. Johnson*, 192 Ill. 2d 202, 206 (2000). However, despite the failure to comply with Rule

12

341, a reviewing court will usually admonish the attorney but still address the issues on appeal if the record is short and the issues are simple. *Id.* Here, Sally failed to cite the record in the argument section of her brief, but she cited the record in the "Statement of Facts" section. The record on appeal is short, and the issues are simple. As such, her failure does not necessarily hinder our review or require us to scour the record. We therefore admonish Sally that she must comply with court rules but choose to address her issues.

¶ 42    Plaintiffs further contend that Sally forfeited her arguments by failing to object to the trial court's damages award. They note that Sally concedes she raised the issues for the first time in her posttrial motion. We do not find Sally's failure to object renders her arguments forfeited.

¶ 43    Here, the issues regard the amount of damages awarded, which was not known until the court made its ruling. Sally was not required to interrupt the court while it announced the judgment in order to preserve her arguments on appeal. See *People v. Mitchell*, 152 Ill. 2d 274, 324-25 (1992) (finding the issue of whether the court incorrectly recounted the facts during its motion to suppress ruling was not forfeited despite the defendant not objecting at the time); *People v. Odle*, 128 Ill. 2d 111, 134 (1988) (finding the issue of whether the court improperly considered an element of the offense when sentencing the defendant was not forfeited despite defendant not objecting during the sentencing hearing). Thus, the first opportunity Sally had to raise an issue was her posttrial motion, which she did. Plaintiffs' authority cited in support of its position is distinguishable because all regard parties who did not raise the issue at the first opportunity. See *Angelini v. Snow*, 58 Ill. App. 3d 116, 118 (1978) (found plaintiff forfeited argument that it was error to find contributory negligence where plaintiff proceeded under contributory negligence theory and failed to object to instructions on contributory negligence); *Stephenson v. Dreis & Krump Manufacturing Co.*, 101 Ill. App. 3d 380, 387 (1981) (found defendant forfeited an instructions issue where

13

defendant did not object to instruction until the posttrial motion); *People v. LeCour*, 273 Ill. App. 3d 1003, 1010 (1995) (found defendant forfeited alleged discovery error where defendant first argued an informant should be identified in his posttrial motion). Accordingly, under the circumstances of this case, we find Sally did not forfeit any challenge to the amount of damages awarded based on her failure to object during the court's announcement of the judgment.

¶ 44    Turning to the merits, we review the question of whether punitive damages was an available remedy *de novo*. *Kaytor v. Southern Illinois Hospital Services*, 2025 IL App (5th) 240416, ¶ 133. However, the standard of review for an issue regarding the amount of compensatory or punitive damages "is whether the verdict is against the manifest weight of the evidence." *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245, ¶ 94; see also *Kaytor*, 2025 IL App (5th) 240416, ¶ 137. " 'A verdict is against the manifest weight when it is arbitrary, unreasonable, or not based upon any evidence.' " *Bruntjen*, 2014 IL App (5th) 120245, ¶ 94 (quoting *Hollowell v. Wilder Corp. of Delaware*, 318 Ill. App. 3d 984, 990 (2001)).

¶ 45    Sally first contends that the punitive damages award violated section 2-1115.05(a) of the Code (735 ILCS 5/2-1115.05(a) (West 2022)). Plaintiffs argue that the punitive damages award complied with the statute.

¶ 46    Both parties overlook the fact that section 2-1115.05(a) of the Code has been deemed unconstitutional. *Best v. Taylor Machine Works*, *et al.*, 179 Ill. 2d 367, 378 (1997). In *Best*, the Illinois Supreme Court held that injury sections 2-1115.1, 3.5(a), 1117, 2-1003, 8-802, 8-2001, 8-2003 of the Code (735 ILCS 5/2-1115.1, 3.5(a), 1117, 2-1003, 8-802, 8-2001, 8-2003 (West 1996)) were unconstitutional and unseverable from the remainder of Public Act 89-7. *Best*, 179 Ill. 2d at 378. Therefore, section 2-1115.05 of the Code is also unconstitutional (*Brdar v. Cottrell, Inc.*, 372 Ill. App. 3d 690, 708 (2007)) and not applicable here.

14

¶ 47    Sally also argues that her punitive damages award violated her due process rights on the basis that the Seventh Circuit in *Saccameno*, 943 F.3d at 1086, held punitive damages could not exceed compensatory damages. We find *Saccameno* fails to support Sally's position.

¶ 48    In *Saccameno*, the Seventh Circuit held that the facts in that case warranted limiting the compensatory to punitive damages ratio to no more than 1:1 and reduced a $3 million punitive damages award to $582,000. *Id.* at 1086, 1090. *Saccameno*'s discussion of the 1:1 ratio, however, was limited to the facts of the case. Indeed, in analyzing the validity of the punitive damage awards, the court considered "three guide-posts: the degree of reprehensibility, the disparity between the harm suffered and the damages awarded, and the difference between the award and comparable civil penalties." *Id.* at 1086. In discussing the disparity between the harm suffered and the damages awarded, *Saccameno* noted that the United States Supreme Court "has been reluctant to provide strict rules regarding" the ratio between compensatory and punitive damages. *Id.* at 1088. *Saccameno* further noted that the Supreme Court has only provided the guidance that (1) few awards exceeding a single digit ratio will satisfy due process; (2) higher ratios may be appropriate when the actual damages are small; and (3) "the ratio should not be confined to actual harm" and can account for potential harm. *Id.* It explained that "a 'substantial' award merits a ratio closer to 1:1[,]" but "[w]hat counts as substantial depends on the facts of the case, and an award of this size (or larger) might not mandate a 1:1 ratio on another set of facts." *Id.* at 1090. *Saccameno* therefore in no way created a hardline rule that punitive damages could never be more than a 1:1 ratio with compensatory damages.

¶ 49    Sally makes no argument regarding the factors and considerations discussed in *Saccameno*; her argument is limited to her mistaken impression that *Saccameno* held punitive damages cannot exceed compensatory damages. Accordingly, her argument to reverse on this basis fails.

15

¶ 50   We also reject Sally's third argument that the court abused its discretion in entering the compensatory and punitive damages award where it did not account for plaintiffs' inconsistent conduct. Citing the Trial Handbook for Illinois Lawyers, (Hunter, *et al.* 2015) at 758-59, Sally contends that any reasonable tenant would have moved out or not fought an eviction if the landlord was sending the tenant nasty text messages.

¶ 51   It is unclear if Sally contends plaintiffs' inconsistent conduct requires a reduction of the damages award or bars any damages award; regardless, Sally provides no authority for either position. Sally instead relies on authority that provides that it is proper to cross-examine a witness regarding acts or conduct that are inconsistent with what would be the natural or probable course of action. Sally was offered the opportunity to cross-examine plaintiffs about inconsistent conduct. Importantly, plaintiffs testified to their inconsistent conduct of Sally visiting Joseph in the hospital and them staying in the apartment despite Sally's actions, explaining that it was difficult for Joseph to find another suitable place to live. Thus, the information was before the court and there is nothing in the record indicating the court declined to consider the evidence before it. The trier of fact is tasked with assessing witnesses' credibility and we will not substitute our judgment for that of the trial court. *Best v. Best*, 223 Ill. 2d 342, 351 (2006). Because the inconsistent conduct was presented for the court's consideration and Sally failed to provide any authority that such inconsistent conduct requires reduction of or bars damages, her argument fails.

¶ 52                                    III. CONCLUSION

¶ 53   Defendant's challenges to the compensatory and punitive damages awards are rejected where section 2-1115.05 of the Code is inapplicable to this case, punitive damages need not be equal or less than compensatory damages, and the court considered plaintiffs' inconsistent conduct

in entering the damages award judgment. Accordingly, we affirm the court's August 15, 2023, and October 23, 2023, orders.

¶ 54     Affirmed.